# EXHIBIT A

EXHIBIT A TO COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**U.S. RIGHT TO KNOW**
*Pursuing truth and transparency for public health*

September 6, 2024

Arianne Perkins
Department of Health and Human Services
Freedom of Information Act Office
Hubert H. Humphrey Building, Room 729H
200 Independence Avenue SW
Washington, DC 20201

Via email: FOIARequest@hhs.gov

RE:     Freedom of Information Act request

Dear Ms. Perkins:

This is a two-part request under the Freedom of Information Act, 5 U.S.C. § 552, et seq., to the U.S. Department of Health and Human Services (HHS).

We request documents pertaining to the following former or current HHS employees who participated in the Potential Pandemic Pathogens Care and Oversight (P3CO) review committee:

- Carrie Wolinetz, former Chief of Staff, National Institutes of Health (NIH)
- David J. Spiro, Director of the Division of International Epidemiology and Population Studies, Fogarty International Center (FIC), NIH
- Irene Glowinski, Former Deputy Director, National Institute of Allergy and Infectious Diseases (NIAID), NIH
- Dennis Dixon, Chief, Bacteriology and Mycology Branch, NIAID
- Andrew Ford, Policy and Strategic Planning Team Lead, NIAID
- Teresa Hauguel, former Acting Chief, Respiratory Diseases Branch, NIAID
- Linda Lambert, former Deputy Director, Biomedical Advanced Research and Development Authority (BARDA), HHS

**Part I.** We request all meeting minutes for the P3CO review committee or gain of function research of concern meeting from January 1, 2017 to December 31, 2019.

Senator Rand Paul's office has confirmed the existence of this weekly meeting. The relevant pages of the hearing transcript are attached to this request (Attachment #1).

**Part II.** We seek all communications by letter or email to or from the above employees (including CC and BCC, and their attachments) containing the following keywords:

- "SARS coronavirus"
- "Spike" AND "furin"
- "ACE2"
- "P3CO"
- Gain of function OR "GOF" (in all capital letters)
- "Dual use research of concern" OR "Dual-use research of concern" OR "DURC"

The time frame of Part II of this request is from January 1, 2017 to December 31, 2019.

We request that you disclose these documents and materials as they become available to you, without waiting until all the documents have been assembled. If documents are denied in whole or in part, please specify which exemption(s) is (are) claimed for each passage or whole document denied. Give the number of pages in each document and the total number of pages pertaining to this request and the dates of documents withheld. We request that excised material be "blacked out" rather than "whited out" or cut out and that the remaining non-exempt portions of documents be released as provided under the Freedom of Information Act.

Please advise of any destruction of records and include the date of and authority for such destruction. As we expect to appeal any denials, please specify the office and address to which an appeal should be directed.

2

**REQUEST FOR FEE WAIVER**

FOIA was designed to provide citizens a broad right to access government records. FOIA's basic purpose is to "open agency action to the light of public scrutiny," with a focus on the public's "right to be informed about what their government is up to." *NARA v. Favish*, 541 U.S. 157, 171 (2004) quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773-74 (1989) (internal quotation and citations omitted). In order to provide public access to this information, FOIA's fee waiver provision requires that "[d]ocuments shall be furnished without any charge or at a [reduced] charge," if the request satisfies the standard. 5 U.S.C. § 552(a)(4)(A)(iii). FOIA's fee waiver requirement is "liberally construed." *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1310 (D.C. Cir. 2003); *Forest Guardians v. U.S. Dept. of Interior*, 416 F.3d 1173, 1178 (10th Cir. 2005).

The 1986 fee waiver amendments were designed specifically to provide non-profit organizations such as U.S. Right to Know access to government records without the payment of fees. Indeed, FOIA's fee waiver provision was intended "to prevent government agencies from using high fees to discourage certain types of requesters and requests," which are "consistently associated with requests from journalists, scholars, and *non-profit public interest groups*." *Ettlinger v. FBI*, 596 F. Supp. 867, 872 (D. Mass. 1984) (emphasis added). As one Senator stated, "[a]gencies should not be allowed to use fees as an offensive weapon against requesters seeking access to Government information … ." 132 Cong. Rec. S. 14298 (statement of Senator Patrick Leahy).

**I. U.S. Right to Know Qualifies for a Fee Waiver.**

Under FOIA, a party is entitled to a fee waiver when "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the [Federal] government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

Thus, the HHS must consider six factors to determine whether a request is in the public interest: (1) whether the subject of the requested records concerns "the operations or activities of the Federal government," (2) whether the disclosure is "likely to contribute" to an understanding of government operations or activities, (3) whether the disclosure "will contribute to public understanding" of a reasonably broad audience of persons interested in the subject, (4) whether the disclosure is likely to contribute "significantly" to public understanding of government operations or activities. *Id*. § 2.107(1)(2), (5) whether a commercial interest exists and its magnitude, and (6) the primary interest in disclosure. As shown below, U.S. Right to Know meets each of these factors.

    **A. The Subject of This Request Concerns "The Operations and Activities of the Government."**

The subject matter of this request concerns the operations and activities of the HHS. This request is about the HHS's knowledge of high-risk research of concern as it relates to the origins of the COVID-19 pandemic.

This FOIA will provide U.S. Right to Know and the public with crucial insight into the activities of the HHS in relation to the US Government's efforts to regulate high risk research. It is clear that a federal agency's oversight of health, safety and security threats, both foreign and in the U.S. is a specific and identifiable activity of the government, and in this case it is the executive branch agency of the HHS. *Judicial Watch*, 326 F.3d at 1313 ("[R]easonable specificity is all that FOIA requires with regard to this factor") (internal quotations omitted). Thus, U.S. Right to Know meets this factor.

### B. Disclosure is "Likely to Contribute" to an Understanding of Government Operations or Activities.

The requested records are meaningfully informative about government operations or activities and will contribute to an increased understanding of those operations and activities by the public.

Disclosure of the requested records will allow U.S. Right to Know to convey to the public information about the HHS's activities in relation to gain-of-function experiments and dual-use research of concern. Once the information is made available, U.S. Right to Know will analyze it and present it to the general public in a manner that will meaningfully enhance the public's understanding of this topic.

Thus, the requested records are likely to contribute to an understanding of the HHS's operations and activities.

### C. Disclosure of the Requested Records Will Contribute to a Reasonably Broad Audience of Interested Persons' Understanding of the HHS's oversight of high-risk research

The requested records will contribute to public understanding of whether the HHS's actions concerning high-risk research were consistent with its mission and purpose to "provide objective oversight to promote the economy, efficiency, effectiveness, and integrity of HHS programs, as well as the health and welfare of the people they serve."  As explained above, the records will contribute to public understanding of this topic.

Activities of the HHS generally, and specifically its activities to regulate research involving the manipulation of high-risk pathogens are areas of interest to a reasonably broad segment of the public. U.S. Right to Know will use the information it obtains from the disclosed records to educate the public at large about this topic. *See W. Watersheds Proj. v. Brown*, 318 F. Supp.2d 1036, 1040 (D. Idaho 2004) (finding that "WWP adequately specified the public interest to be

served, that is, educating the public about the ecological conditions of the land managed by the BLM and also how ... management strategies employed by the BLM may adversely affect the environment").

Through U.S. Right to Know's synthesis and dissemination (by means discussed in Section II, below), disclosure of information contained in and gleaned from the requested records will contribute to a broad audience of persons who are interested in the subject matter. *Ettlinger v. FBI*, 596 F. Supp. at 876 (benefit to a population group of some size distinct from the requester alone is sufficient); *Carney v. Dept. of Justice*, 19 F.3d 807, 815 (2d Cir. 1994), *cert. denied*, 513 U.S. 823 (1994) (applying "public" to require a sufficient "breadth of benefit" beyond the requester's own interests); *Cmty. Legal Servs. v. Dep't of Hous. & Urban Dev.*, 405 F. Supp.2d 553, 557 (E.D. Pa. 2005) (in granting fee waiver to community legal group, court noted that while the requester's "work by its nature is unlikely to reach a very general audience," "there is a segment of the public that is interested in its work").

Indeed, the public does not currently have an ability to easily evaluate the requested records, which are not currently in the public domain. *See Cmty. Legal Servs.*, 405 F. Supp.2d at 560 (because requested records "clarify important facts" about agency policy, "the CLS request would likely shed light on information that is new to the interested public."). As the Ninth Circuit observed in *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1286 (9th Cir. 1987), "[FOIA] legislative history suggests that information [has more potential to contribute to public understanding] to the degree that the information is new and supports public oversight of agency operations... ."1[1]

Disclosure of these records is not only "likely to contribute," but is certain to contribute, to public understanding of HHS's activities toward regulating high-risk virology research. The public is always well served when it knows how the government conducts its activities. Hence, there can be no dispute that disclosure of the requested records to the public will educate the public about this pressing issue.

**II. Disclosure is Likely to Contribute Significantly to Public Understanding of Government Operations or Activities.**

U.S. Right to Know is not requesting these records merely for their intrinsic informational value. Disclosure of the requested records will significantly enhance the public's understanding of what the HHS knows about the gain-of-function and dual-use research, as compared to the level of public understanding that existed prior to the disclosure. The records are also certain to shed light on the HHS's compliance with its own mission and purpose. Such public oversight of agency action is vital to our democratic system and clearly envisioned by the drafters of the FOIA. Thus, U.S. Right to Know meets this factor as well.

**III. Obtaining the Requested Records is of No Commercial Interest to U.S. Right to Know**

5

Access to government records, disclosure forms, and similar materials through FOIA requests is essential to U.S. Right to Know's role of educating the general public. Founded in 2014, U.S. Right to Know is a 501(c)(3) nonprofit public interest, public health organization (EIN: 46-5676616). U.S. Right to Know has no commercial interest and will realize no commercial benefit from the release of the requested records.

**IV. U.S. Right to Know's Primary Interest in Disclosure is the Public Interest.**

As stated above, U.S. Right to Know has no commercial interest that would be furthered by disclosure. Although even if it did have an interest, the public interest would far outweigh any pecuniary interest.[1]

U.S. Right to Know is a non-profit organization that informs, educates, and counsels the public regarding corporate wrongdoing and government failures that threaten the integrity of our food system, our environment and our health. U.S. Right to Know has been substantially involved in the activities of numerous government agencies for over eight years, and has consistently displayed its ability to disseminate information granted to it through FOIA.

In granting U.S. Right to Know's fee waivers, agencies have recognized: (1) that the information requested by U.S. Right to Know contributes significantly to the public's understanding of the government's operations or activities; (2) that the information enhances the public's understanding to a greater degree than currently exists; (3) that U.S. Right to Know possesses the expertise to explain the requested information to the public; (4) that U.S. Right to Know possesses the ability to disseminate the requested information to the general public; (5) and that the news media recognizes U.S. Right to Know as an established expert in the field of public health. U.S. Right to Know's track record of active participation in oversight of governmental activities and decision making, and its consistent contribution to the public's understanding of those activities as compared to the level of public understanding prior to disclosure are well established.

U.S. Right to Know intends to use the records requested here similarly. U.S. Right to Know's work appears frequently in news stories online and in print, radio and TV, including reporting in outlets such as *The New York Times* and *The Guardian*, as well as medical and public health journals such as the *BMJ*. Many media outlets have reported about the food and chemical industries using information obtained by U.S. Right to Know from federal agencies. In 2023, nearly 500,000 people visited U.S. Right to Know's extensive website, and viewed pages more than 760,000 times. U.S. Right to Know and its staff regularly tweet to a combined following of more than 75,000 on Twitter, and 10,000 people follow U.S. Right to Know on Facebook. U.S. Right to Know intends to use any or all of these media outlets to share with the public information obtained as a result of this request.

---

[1] In this connection, it is immaterial whether any portion of U.S. Right to Know's request may currently be in the public domain because U.S. Right to Know requests considerably more than any piece of information that may currently be available to other individuals. *See Judicial Watch*, 326 F.3d at 1315.

Public oversight and enhanced understanding of the HHS's duties is absolutely necessary. In determining whether disclosure of requested information will contribute significantly to public understanding, a guiding test is whether the requester will disseminate the information to a reasonably broad audience of persons interested in the subject. *Carney*, 19 F.3d 807. U.S. Right to Know need not show how it intends to distribute the information, because "[n]othing in FOIA, the [agency] regulation, or our case law require[s] such pointless specificity." *Judicial Watch*, 326 F.3d at 1314. It is sufficient for U.S. Right to Know to show how it distributes information to the public generally. *Id.*

Please send the documents electronically in PDF format to Emily Kopp at emily@usrtk.org. If you need additional information please call, rather than write, Emily at (770) 789-4628.

Thank you so much for your help in filling this request.


Sincerely,


Emily Kopp
Investigative Reporter

Hana Mensendiek
Investigator

Gary Ruskin
Executive Director

Uh Dr. Parker, you've had a long distinguished careers. Have you ever directed any of your employees to take down fellow scientists who you disagreed with?

GERALD PARKER:

No.

RAND PAUL:

Dr. Redfield, you've had a long and distinguished career. Have you ever um, directed any of your employees to take down scientists who you had a disagreement with?

ROBERT REDFIELD:

No.

RAND PAUL:

Dr. Esvelt, same question?

KEVIN ESVELT:

No.

RAND PAUL:

Dr. Wolinetz, um, did you attend the gain of function dual use research of concern meetings during your tenure in government?

CARRIE WOLINETZ:

Yes.

RAND PAUL:

Were you considered to be a member?

CARRIE WOLINETZ:

A member of what specifically, senator?

RAND PAUL:

I don't know. Is there -- is there a group called that? Is it a meeting? Who gets to go? Were you --

CARRIE WOLINETZ:

So I participated in many groups inside governments in which biosecurity, management of dual use research, so --

RAND PAUL:

Right. This is a very specific meeting, though. This is the week -- it's called in this email weekly dual use research of concern, gain of function meeting. Uh, did you attend those routinely?

CARRIE WOLINETZ:

I don't recall a meeting called that, although it's quite possible I was -- was involved. That name doesn't ring a bell.

RAND PAUL:

This would be a meeting to discuss things that might be gain of function. Did you attend those meetings?

CARRIE WOLINETZ:

Uh, um, not if they were meetings at the level of an individual NIH institute to review research. I was not at all involved in that process.

RAND PAUL:

This is an email, it's from Theresa, I don't know how you pronounce it, Hagwell -- Hogwell. How -- do you know how to say it? HAUGUEL? And it's to -- Let's see an Irene Glowinski, Dennis Dixon, Linda Lambert, David Spiro. Are you familiar with those names?

CARRIE WOLINETZ:

I believe those are all employees of NIAID.

RAND PAUL:

OK. So you think this meeting may have occurred within NIAID and you might not have participated in it?

CARRIE WOLINETZ:

Yes, that's correct.

RAND PAUL:

OK. Um, are you surprised that when I ask for the debate over what is and what is not because there's a debate over what is the definition of gain of function that the NIH still refuses to give me minutes of these meetings or any of the discussion concerning what is gain of function and what is not gain of function?

CARRIE WOLINETZ:
I can't speak to NIH's decision.

RAND PAUL:
Do you think that's an appropriate policy for the NIH to refuse to give members of Congress the debate over whether something is or is not gain of function?

CARRIE WOLINETZ:
My general philosophy at NIH was to always be as cooperative with members of Congress as humanly possible.

RAND PAUL:
Your boss, not so much when he was -- he was -- before that, when he wasn't busy taking down fellow scientific colleagues. Dr. Parker, do you think it's appropriate for the NIH to refuse to give Congress the minutes or deliberations over what is or what is not gain of function, particularly concerning research that was done in Wuhan?

GERALD PARKER:
Inappropriate.

RAND PAUL:
Dr. Redfield, do you think the NIH should release -- do you think it's inappropriate that they won't release and should they release the information concerning the deliberations over gain of function?

ROBERT REDFIELD:
Yeah, I think it's inappropriate that they don't share that information.

RAND PAUL:
Dr. Esvelt, do you think it's inappropriate that the NIH continues to refuse to reveal information considering the deliberations over gain of function?

KEVIN ESVELT:

I think transparency is essential to public trust in science. And I think NIH has a duty to uphold public trust in science insofar as possible.

RAND PAUL:

The public needs to realize that I only know of this meeting existing because of a Freedom of Information Act. The Senate, groups of senators, the ranking member of a committee and they will not reveal they even have the meeting much less the minutes of the meeting. I can get more information from the CIA than the NIH. Dr. Redfield, do you think that damages science when the science are acting like the CIA and not revealing information, does it damage our trust in science?

ROBERT REDFIELD:

I think it's going to be very hard for public trust to be regained, you know, at NIH, CDC, FDA uh, from what we experienced in the COVID pandemic.

RAND PAUL:

Dr. Redfield, do you think, and we talked a little bit about this before, but taking the backbone of a SARS virus and adding various S proteins from other unknown viruses to see what you get running through that through serial passage, should that have gone before some sort of gain of function, um, review, even if it -- you know, to figure out whether it meets a definition of dangerous research?

ROBERT REDFIELD:

Yes.

RAND PAUL:

One of Anthony Fauci's responses has been -- well, there are two animal viruses and we don't know that they will infect humans. But by the time you combine them, the test they do is they actually test them to see if they infect human cells after they're done manipulating them. So their goal really is to see, hey, guys, do you think we can make it more infectious.

And yet they say and they hide behind definitions of well, we didn't know in advance. And this becomes -- becomes the problem. And look, I come from a scientific background, I'm aware of CRISPR technology, not enough to do it, but aware of the -- the great benefits of science. I'm aware of creating bacteria that make insulin.