# EXHIBIT B

EXHIBIT B TO COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF



**U.S. RIGHT TO KNOW**
*Pursuing truth and transparency for public health*

July 16, 2025

FOIA Officer
U.S. Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201

**Submitted via email to FOIARequest@hhs.gov**

    **RE:    Freedom of Information Act request**

Dear FOIA Officer:

This is a request under the Freedom of Information Act (5 U.S.C. § 552). I respectfully request copies of records capturing the communications of the former Health and Human Services Secretary during the early stages of the COVID-19 pandemic, containing discussions about the origins and early stages of the outbreak.

Please search for emails, including those with any carbon copy (cc) and blind carbon copy (bcc), and attachments, sent or received by HHS Secretary Alex Azar (including communications sent to or from his official department address Alex.Azar@hhs.gov) between November 1, 2019, and May 1, 2020, that were exchanged with any of the following individuals or email addresses/domains:

- Anthony Fauci
    - afauci@niaid.nih.gov
    - af10r@nih.gov
    - anthony.fauci@nih.gov
    - anthony.fauci@nih.hhs.gov
- Francis Collins
    - collinsf@mail.nih.gov

- Christopher Ford
    - FordCA@state.gov
- Robert Kadlec
    - Robert.Kadlec@hhs.gov
- Robert Redfield
    - olx1@cdc.gov
- Deborah Birx
    - deborah.birx@gmail.com
    - dbirx@whitehouse.gov
    - deborah.birx@who.eop.gov
- Katherine L. O'Brien
    - obrienk@who.int
- Matthew Pottinger
    - mpottinger@eop.who.gov
    - matthew.pottinger@eop.who.gov

Please limit your search to only emails or email threads that contain one or more of the following keywords in the subject line or message body (including attachments):

- "nCoV"
- "SARS" AND "origin"
- "COVID" AND "origin"
- "furin"
- "leak"
- "accident"
- "Incident"


We request that you disclose these documents and materials as they become available to you, without waiting until all the documents have been assembled. If documents are denied in whole or in part, please specify which exemption(s) is (are) claimed for each passage or whole document denied. Give the number of pages in each document and the total number of pages about this request, and the dates of documents withheld. We request that excised material be "blacked out" rather than "whited out" or cut out and that the remaining non-exempt portions of documents be released as provided under the Freedom of Information Act.

Please advise of any destruction of records and include the date of and authority for such destruction.

**REQUEST FOR FEE WAIVER**

FOIA was designed to provide citizens with a broad right to access government records. FOIA's basic purpose is to "open agency action to the light of public scrutiny," with a focus on the public's "right to be informed about what their government is up to." *NARA v. Favish*, 541 U.S. 157, 171 (2004) quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773- 74 (1989) (internal quotation and citations omitted). To provide public access to this information, FOIA's fee waiver provision requires that "[d]ocuments shall be furnished without any charge or at a [reduced] charge," if the request satisfies the standard. 5 U.S.C. § 552(a)(4)(A)(iii). FOIA's fee waiver requirement is "liberally construed." *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1310 (D.C. Cir. 2003); *Forest Guardians v. U.S. Dept. of Interior*, 416 F.3d 1173, 1178 (10th Cir. 2005).

The 1986 fee waiver amendments were designed specifically to provide non-profit organizations, such as U.S. Right to Know, access to government records without the payment of fees. Indeed, FOIA's fee waiver provision was intended "to prevent government agencies from using high fees to discourage certain types of requesters and requests," which are "consistently associated with requests from journalists, scholars, and *non-profit public interest groups*." *Ettlinger v. FBI*, 596 F. Supp. 867, 872 (D. Mass. 1984) (emphasis added). As one Senator stated, "[a]gencies should not be allowed to use fees as an offensive weapon against requesters seeking access to Government information … ." 132 Cong. Rec. S. 14298 (statement of Senator Patrick Leahy).

**I. U.S. Right to Know Qualifies for a Fee Waiver.**

Under FOIA, a party is entitled to a fee waiver when "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the [Federal] government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

Thus, the HHS must consider six factors to determine whether a request is in the public interest: (1) whether the subject of the requested records concerns "the operations or activities of the Federal government," (2) whether the disclosure is "likely to contribute" to an understanding of government operations or activities, (3) whether the disclosure "will contribute to public understanding" of a reasonably broad audience of persons interested in the subject, (4) whether the disclosure is likely to contribute "significantly" to public understanding of government operations or activities. *Id*. § 2.107(1)(2), (5) whether a commercial interest exists and its magnitude, and (6) the primary interest in disclosure. As

3

shown below, U.S. Right to Know meets each of these factors.

### A. The Subject of This Request Concerns "The Operations and Activities of the Government."

The subject matter of this request concerns the operations and activities of the HHS. This request is about the HHS Secretary's knowledge of intelligence about the origins of the COVID-19 pandemic.

This FOIA will provide U.S. Right to Know and the public with crucial insight into the activities of the HHS about the US Government's efforts to utilize information from foreign partners in understanding the origins of the COVID-19 pandemic. It is clear that a federal agency's oversight of health, safety and security threats, both foreign and in the U.S., is a specific and identifiable activity of the government, and in this case, it is the executive branch agency of the HHS. *Judicial Watch*, 326 F.3d at 1313 ("[R]easonable specificity is all that FOIA requires about this factor") (internal quotations omitted). Thus, U.S. Right to Know meets this factor.

### B. Disclosure is "Likely to Contribute" to an Understanding of Government Operations or Activities.

The requested records are meaningfully informative about government operations or activities and will contribute to an increased understanding of those operations and activities by the public.

Disclosure of the requested records will allow U.S. Right to Know to convey to the public information about the HHS's activities related to intelligence its secretary received on the origins of COVID-19. Once the information is made available, U.S. Right to Know will analyze it and present it to the general public in a manner that will meaningfully enhance the public's understanding of this topic.

Thus, the requested records are likely to contribute to an understanding of the HHS's operations and activities.

### C. Disclosure of the Requested Records Will Contribute to a Reasonably Broad Audience of Interested Persons' Understanding of the Origins of the COVID-19 Pandemic

4

The requested records will contribute to public understanding of whether the HHS's actions relating to finding origins of COVID-19 were consistent with its mission to "to enhance the health and well-being of all Americans, by providing for effective health and human services and by fostering sound, sustained advances in the sciences underlying medicine, public health, and social services." As explained above, the records will contribute to public understanding of this topic.

Activities of the HHS generally, and specifically its Secretary's decision-making, formed based on the origins of the COVID-19 pandemic by using available intelligence from both federal intelligence agencies and international networks, are areas of interest to a reasonably broad segment of the public. U.S. Right to Know will use the information it obtains from the disclosed records to educate the public at large about this topic. *See W. Watersheds Proj. v. Brown*, 318 F. Supp.2d 1036, 1040 (D. Idaho 2004) (finding that "WWP adequately specified the public interest to be served, that is, educating the public about the ecological conditions of the land managed by the BLM and also how ... management strategies employed by the BLM may adversely affect the environment").

Through U.S. Right to Know's synthesis and dissemination (by means discussed in Section II, below), disclosure of information contained in and gleaned from the requested records will contribute to a broad audience of persons who are interested in the subject matter. *Ettlinger v. FBI*, 596 F. Supp. at 876 (benefit to a population group of some size distinct from the requester alone is sufficient); *Carney v. Dept. of Justice*, 19 F.3d 807, 815 (2d Cir. 1994), *cert. denied*, 513 U.S. 823 (1994) (applying "public" to require a sufficient "breadth of benefit" beyond the requester's own interests); *Cmty. Legal Servs. v. Dep't of Hous. & Urban Dev.*, 405 F. Supp.2d 553, 557 (E.D. Pa. 2005) (in granting fee waiver to community legal group, court noted that while the requester's "work by its nature is unlikely to reach a very general audience," "there is a segment of the public that is interested in its work").

Indeed, the public does not currently have an ability to easily evaluate the requested records, which are not currently in the public domain. *See Cmty. Legal Servs.*, 405 F. Supp.2d at 560 (because requested records "clarify important facts" about agency policy, "the CLS request would likely shed light on information that is new to the interested public."). As the Ninth Circuit observed in *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1286 (9th Cir. 1987), "[FOIA] legislative history suggests that information [has more potential to contribute to public understanding] to the degree that the information is new and supports public oversight of agency operations... ."1[1]

Disclosure of these records is not only "likely to contribute," but is certain to contribute, to

5

public understanding of HHS's actions and decision-making based on intelligence of the early stages or origins of the COVID-19 pandemic. The public is always well served when it knows how the government conducts its activities, particularly matters touching on legal questions. Hence, there can be no dispute that disclosure of the requested records to the public will educate the public about this pressing issue.

**II. Disclosure is Likely to Contribute Significantly to Public Understanding of Government Operations or Activities.**

U.S. Right to Know is not requesting these records merely for their intrinsic informational value. Disclosure of the requested records will significantly enhance the public's understanding of what the HHS Secretary knew about the origins of the COVID-19 pandemic, as compared to the level of public understanding that existed prior to the disclosure. The records are also certain to shed light on the HHS's compliance with its own mission and purpose. Such public oversight of agency action is vital to our democratic system and clearly envisioned by the drafters of the FOIA. Thus, U.S. Right to Know meets this factor as well.

**III. Obtaining the Requested Records is of No Commercial Interest to U.S. Right to Know**

Access to government records, disclosure forms, and similar materials through FOIA requests is essential to U.S. Right to Know's role of educating the general public. Founded in 2014, U.S. Right to Know is a 501(c)(3) nonprofit public interest, public health organization (EIN: 46-5676616). U.S. Right to Know has no commercial interest and will realize no commercial benefit from the release of the requested records.

**IV. U.S. Right to Know's Primary Interest in Disclosure is the Public Interest.**

As stated above, U.S. Right to Know has no commercial interest that would be furthered by disclosure. Although even if it did have an interest, the public interest would far outweigh any pecuniary interest.[1]

U.S. Right to Know is a non-profit organization that informs, educates, and counsels the public regarding corporate wrongdoing and government failures that threaten our food system, our

---

[1] In this connection, it is immaterial whether any portion of U.S. Right to Know's request may currently be in the public domain because U.S. Right to Know requests considerably more than any piece of information that may currently be available to other individuals. *See Judicial Watch*, 326 F.3d at 1315.

environment, and our health. U.S. Right to Know has been substantially involved in the activities of numerous government agencies for over ten years and has consistently displayed its ability to disseminate information granted to it through FOIA.

In granting U.S. Right to Know's fee waivers, agencies have recognized: (1) that the information requested by U.S. Right to Know contributes significantly to the public's understanding of the government's operations or activities; (2) that the information enhances the public's understanding to a greater degree than currently exists; (3) that U.S. Right to Know possesses the expertise to explain the requested information to the public; (4) that U.S. Right to Know possesses the ability to disseminate the requested information to the general public; (5) and that the news media recognizes U.S. Right to Know as an established expert in the field of public health. U.S. Right to Know's track record of active participation in oversight of governmental activities and decision making, and its consistent contribution to the public's understanding of those activities as compared to the level of public understanding before disclosure, are well established.

U.S. Right to Know intends to use the records requested here similarly. U.S. Right to Know's work appears frequently in news stories online and in print, radio, and TV, including reporting in outlets such as *The New York Times* and *The Guardian*, as well as medical and public health journals such as the *BMJ*. Many media outlets have reported on the food and chemical industries using information obtained by U.S. Right to Know from federal agencies. In 2024, more than 320,000 people visited U.S. Right to Know's extensive website and viewed pages more than 550,000 times. U.S. Right to Know and its staff regularly tweet to a combined following of 55,000 on X (formerly Twitter), and more than 10,000 people follow U.S. Right to Know on Facebook. U.S. Right to Know has more than 17,000 subscribers to its newsletter. U.S. Right to Know intends to use any or all of these distribution channels to share with the public information obtained as a result of this request.

Public oversight and enhanced understanding of the HHS Secretary's duties are necessary. In determining whether disclosure of requested information will contribute significantly to public understanding, a guiding test is whether the requester will disseminate the information to a reasonably broad audience of persons interested in the subject. *Carney*, 19 F.3d 807. U.S. Right to Know need not show how it intends to distribute the information, because "[n]othing in FOIA, the [agency] regulation, or our case law require[s] such pointless specificity." *Judicial Watch*, 326 F.3d at 1314. It is sufficient for U.S. Right to Know to show how it distributes information to the public generally. *Id.*

## REQUEST FOR EXPEDITED PROCESSING

Under FOIA and the HHS's expedited processing regulation, a party who shows "compelling need" is entitled to expedited processing. 5 U.S.C. § 552(a)(6)(E)(i), 45 CFR 5.27 (A)(5)(B). U.S Right to Know easily satisfies the requirements of demonstrating an "urgent need to inform the public."

**I. U.S. Right to Know's Request for Expedited Processing is for Reasons of Urgent Need to Inform the Public.**

The FOIA states that "compelling need" or urgent need exists "with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity" 5 U.S.C. § 552(a)(6)(E)(v)(II). The HHS's expedited processing regulation states that an "urgent need to inform the public" can exist regarding "an actual or alleged Federal Government activity" when requested by a "person primarily engaged in disseminating information to the public." As demonstrated below, U.S. Right to Know's request meets all parts of the requirement.

A. **U.S. Right to Know is Primarily Engaged in the Dissemination of Information**

U.S. Right to Know qualifies as a "representative of the news media." U.S. Right to Know is a member of the Institute of Nonprofit News,[2] a national network of 500 independent nonprofit journalism organizations. It has also received journalism awards, including one for coverage of the very topic of this request. In 2025, U.S. Right to Know received a James Madison Freedom of Information Award for its reporting on the origin of COVID-19. The awards, bestowed by the Northern California chapter of the Society for Professional Journalists, recognize people and organizations who have made "significant contributions to advancing freedom of information and expression in the spirit of James Madison, the creative force behind the First Amendment." In its award letter, SPJ NorCal wrote that "U.S. Right to Know's work, and their dedication to pursuing government documents in the face of widespread pushback, has helped the public better understand a pandemic that claimed millions of lives."[3] For FOIA, the HHS must explain any denial of treatment to U.S. Right to Know as a representative of the news media.

---

[2] *See* **https://inn.org/**

[3] Society of Professional Journalists, Northern California Chapter.
**https://spjnorcal.org/2025/02/12/spj-norcal-honors-transparency-champions-in-james-madison-freedom-of-i nfor mation-awards-3/**

U.S. Right to Know thus easily satisfies the definition of an organization primarily engaged in the dissemination of information, i.e., that of "a person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." *Nat. Sec. Archive v. U.S. Dept. of Defense*, 880 18F.2d 1381, 1387 (D.C. Cir. 1989). Indeed, organizations with information dissemination activities that are similar to those of U.S. Right to Know routinely qualify as being "primarily engaged in disseminating information". *See Electronic Privacy Information Center v. Department of Defense*, 241 F. Supp. 2d 5, 11 (D.D.C. 2003) ("EPIC's request for 'news media' status highlighted its publication to date of seven books on privacy, technology and civil liberties issues").

**B. Records Sought are Urgently Needed to Inform the Public of Government Activity**

The topic of this request, which pertains to the origin of a pandemic virus that has killed more than one million Americans, and approximately 20 million people worldwide, is indisputably "a matter of current exigency to the American public" in which "the consequences of delaying a response would compromise a significant recognized interest," two factors routinely considered to comprise an urgent need. *See, for example, Al-Fayed v. C.I.A.*, 254 F.3d 300, 310 (D.C. Cir. 2001). The possibility of a research-related origin of COVID-19 has led to calls to strengthen biosafety regulations nationwide and worldwide.[4] In fact, President Donald Trump signed an Executive Order in May that put broad restrictions on U.S. funding of "dangerous gain-of-function research."[5] However, many hold that the type of virological research under scrutiny is not dangerous and exactly what is needed to prevent future pandemics. Indeed, it is of current and ongoing national debate whether certain research with high-risk pathogens should be more strictly regulated or deregulated to prevent future pandemics. Not only does the ongoing search for the pandemic's origin matter urgently to those who suffered severe consequences of COVID-19 or lost loved ones, but the origin of the pandemic[6] also has immediate consequences for tax allocations and the future direction of science regarding regulations surrounding biosafety.

---

[4] *See e.g.* Carl Zimmer and Benjamin Mueller: **U.S. Tightens Rules on Risky Virus Research,** *The New York Times*. (May 7, 2024.)

[5] 90 FR 19611 (2025). Also available at: **Improving the Safety and Security of Biological Research**. (May 5, 2025)

[6] *See e.g.* David Zweig: **Is Gain-of-Function Research a 'Risk Worth Taking'? Or 'Insanity'?,** *The Free Press.* (March 7, 2023) (Last electronically accessed April 18, 2025); Jocelyn Kaiser: **Making Trouble: The United States is moving to tighten oversight of studies that could make viruses more dangerous. But how far should it go?** (October 19, 2022.); Carl Zimmer and Emily Anthes: **Trump Executive Order Restricts 'Gain of Function' Research on Pathogens**, *The New York Times*. (May 5, 2025); Paula Ebben and Neal Riley: **Scientist who pushed for COVID lab leak theory investigation says high-risk research needs oversight**, CBS News. (May 5, 2025); Alex Mansfield and Tabby Taylor-Buck: **Gain-of-function: Loss-of-funding**, BBC. (May 8, 2025)

In addition, information that the HHS holds about its Secretary's communications and decision-making based on the early stages or origin of COVID-19 is urgently needed to confirm or deny recent claims made by the current administration that a laboratory-related origin of COVID-19 is now confirmed. President Trump recently launched a website,[7] the title of which positions a lab leak as the "true origins of COVID-19." President Trump's appointees, including Secretary of Homeland Security Kristi Noem, FDA Commissioner Marty Makary, and current Health and Human Services Secretary Robert F. Kennedy Jr., have all made statements indicating that the pandemic certainly originated in a laboratory.[8] White House Press Secretary Karoline Leavitt told reporters that a research-related origin of COVID is now "confirmable truth."[9] However, if the state of the U.S. government's knowledge of the origin of the pandemic does not allow it to reach such strong conclusions, the White House is currently misleading the public, and the public urgently needs to know about such ongoing deception. It has been reported that the CIA assesses with "low confidence" that the pandemic originated in a lab.[10] In the case that the White House is making false claims of certainty, the HHS should release what communications and actions its HHS Secretary took during the early stages that could shed light on the origins topic to provide the public with more nuanced information and to counter any misleading statements.

Furthermore, courts have held that the "urgency" standard is essentially synonymous with media interest. *See Electronic Privacy Info. Ctr. v. Nat'l Sec. Comm'n*, 419 F. Supp. 3d 82, 95 (D.D.C. 2019) ("Evidence such as news articles and other contemporary documents may illuminate whether EPIC's FOIA requests meet the 'urgency to inform' standard."); *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 299 (D.D.C. 2017) ("[b]ut as evidence that they were justified [in their claim of urgency to inform the public], one need look no further than the widespread media attention—including by some of the nation's most prominent news outlets"). *Oversight v. U.S. Dep't of Justice*, 292 F. Supp. 3d 501, 507-08 (D.D.C. 2018) (start and end with review of the media coverage). Here, there is no question of media interest in the information that U.S. Right to Know seeks to analyze and disseminate, namely, decision-making and communications of the HHS Secretary with high-ranking U.S. government officials during the early stages of the COVID-19 pandemic and based on intelligence about its origins. Thousands of media articles have been published on the subject since 2020, with

---

[7] *See:* **LAB LEAK: The true origin of COVID-19**.
[8] *See e.g.* Daniel Engber: **Trump Thinks He Knows What Started the Pandemic**, *The Atlantic*. (May 21, 2025).
[9] *See* **Press Secretary Karoline Leavitt Briefs Members of the Media, Jan. 31, 2025**. [Video] (Jan 31, 2025)
[10] *See e.g.* Julian E. Barnes: **C.I.A. Now Favors Lab Leak Theory to Explain Covid's Origins**, The New York Times. (January 25, 2025).

dozens published in the past three months alone.[11] Indeed, courts have routinely found that much lesser showings of media interest are sufficient to warrant expedited processing. *See e.g., American Civil Liberties Union v. United States Department of Justice*, 321 F. Supp. 2d 24, 32 (D.D.C. 2004) (handful of articles sufficient to show sufficient media interest for expedited processing). *Brennan Ctr. for Justice at NYU Sch. of Law v. Dep't of Commerce*, 498 F. Supp. 3d 87, 97 (D.D.C. 2020) (fifty recent articles more than sufficient). Despite the overwhelming media interest, the question of COVID origins, about which U.S. Right to Know seeks to inform the public, has yet to be answered. Both President Donald Trump and leaders in the intelligence community have expressed urgency in declassifying information about what is known of the pandemic's origins to the public.[12]

In addition, the work of the Intelligence Community and other federal agencies – including HHS – in identifying the origin of COVID-19 and declassifying related documents has itself become, and continues to be, an area of interest to the media and the public.[13] Recent news reports have highlighted scientists' views that the government needs to release more details around intelligence assessments on, and communications exchanged by officials about, the pandemic's origin.[14] One recent news story quoted CIA director John Ratcliffe as saying he wants to make declassifying intelligence on the pandemic's origins a priority.[15] The new Director of National Intelligence Tulsi Gabbard has empaneled a task force to declassify information in the public interest, including intelligence related to COVID-19: "President Trump promised the American people maximum transparency and accountability," Gabbard said in a statement about the initiative. "We are committed to executing the president's vision and focusing the intelligence community on its core mission: ensuring our security by providing the president and policymakers with timely, apolitical, objective, relevant intelligence to inform their decision-making to ensure the safety, security, and freedom of the American people."[16]

---

[11] *See* Attachment 1: Recent Media Articles

[12] For example, the White House recently launched a website dedicated to the origin of COVID-19, titled **LAB LEAK: The true origin of COVID-19.**

[13] *See e.g.* Jeremy Herb and Natasha Bertrand: **US Energy Department assesses Covid-19 likely resulted from lab leak, furthering US intel divide over virus origin**, CNN. (February 27, 2023); Jon Cohen: **CIA bribed its own COVID-19 origin team to reject lab-leak theory, anonymous whistleblower claims**, *Science*. (September 12, 2023); Sharri Markson: **US intelligence censored over scientists' findings on likely origins of Covid-19**, *The Australian*. (August 23, 2024); Julian E. Barnes: **C.I.A. Now Favors Lab Leak Theory to Explain Covid's Origins**, The New York Times. (January 25, 2025); Katherine Eban: **Exclusive: Inside the FBI's Lab Leak Investigation**, *Vanity Fair*. (February 27, 2025). Karolina Corin and Lewis Kamb: **US intelligence agency's classified analysis offers detailed scientific view that COVID-19 may have come from Wuhan lab**, *US Right to Know*. (April 7, 2025).

[14] *See e.g.* Daniel Engber: **Trump Thinks He Knows What Started the Pandemic**, *The Atlantic*. (May 21, 2025).

[15] *See e.g.* Julian E. Barnes: **C.I.A. Now Favors Lab Leak Theory to Explain Covid's Origins,** The New York Times. (January 25, 2025).

[16] *See. e.g.* Julian E. Barnes: **Gabbard Starts a Task Force Focused on Politicization of the Intelligence Agencies**, *The New York Times*. (April 8, 2025).

It is furthermore not in dispute that the information sought pertains to "government activity". *See supra* at "REQUEST FOR FEE WAIVER", I (A) (explaining how records sought pertain to "government activity")*.*

Thus, the current request is of an "urgent need," seeking the release of communications exchanged with the then-highest-ranking government health official, with other high-ranking officials, to a person who is primarily engaged in disseminating information with an urgency to inform the public concerning federal government activity. The HHS must address this request for expedited processing; failure to do so is *prima facie* arbitrary and capricious. inform the public concerning federal government activity. The HHS must address this request for expedited processing; failure to do so is *prima facie* arbitrary and capricious.

We certify that the information given above to support our request for expedited processing is true and correct, to the best of our knowledge.

Please send the documents electronically in PDF format to Lewis Kamb at lewis@usrtk.org. If you need additional information, please call, rather than write, Lewis Kamb at (206) 735-6299.

Thank you so much for your help in filling this request.

Sincerely,

Lewis Kamb
Investigative Reporter

Hana Mensendiek
Investigator

Gary Ruskin
Executive Director