Jessica L. Blome (Cal. Bar No. 314898)
Lily A. Rivo (Cal. Bar No. 242688)
Richard A. Brody (Cal. Bar No. 100379)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
Ph/Fax: (510) 900-9502
Email: jblome@greenfirelaw.com
lrivo@greenfirelaw.com
rbrody@greenfirelaw.com

*Attorneys for Plaintiff U.S. Right to Know*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| U.S. RIGHT TO KNOW, a California Non-Profit Corporation,<br>Plaintiff,<br>vs.<br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR DISEASE CONTROL AND PREVENTION,<br>Defendants. | Case No.: 4:26-cv-01971-ASK<br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br>Freedom of Information Act, 5 U.S.C. § 552 *et seq* |

## INTRODUCTION

1. Through this action, Plaintiff U.S. Right to Know (hereinafter "Plaintiff" and/or "USRTK") seeks access to government records held by Defendants U.S. Department of Health and Human Services (hereinafter "Defendant" and/or "HHS"), and Centers for Disease Control and Prevention ("CDC"), which is a division of HHS, pursuant to the Freedom of Information Act (hereinafter "FOIA"), 5 U.S.C. § 552 *et seq.,* and United States Department of Health & Human Services FOIA regulations promulgated thereunder, 45 C.F.R. Part 5. This action challenges Defendant's unlawful failure to abide by the statutory requirements of FOIA and applicable implementing regulations.

2. Defendants are unlawfully withholding from public disclosure information sought by USRTK, information to which USRTK is entitled and for which no valid disclosure exemption applies or has been properly asserted. In particular, Defendants have violated, and remain in violation of, the statutory mandates imposed by the FOIA by: (Count I) failing to provide a timely final determination on USRTK's FOIA Requests; (Count II) unlawfully withholding records from public disclosure for which no valid disclosure exemption applies or has been properly asserted, or to provide the reasonably segregable portions of those records; (Count III) failing to provide an updated "estimated date of completion."

3. The records requested by USRTK are likely to contribute significantly to the understanding of the operations or the activities of the government. USRTK is a 501(c)(3) nonprofit organization and, by its nature, has no commercial interest in the requested records.

4. USRTK seeks declaratory relief establishing that Defendants have violated the FOIA and that such actions entitle USRTK to relief thereunder. USRTK also seeks injunctive relief directing Defendants to conduct a reasonably adequate search for records and to promptly provide responsive material, to reasonably segregate portions of non-exempt records, and to provide proper justifications for any disclosure exemptions that are applied. Finally, USRTK requests that the Court award Plaintiff its reasonable attorneys' fees and costs incurred in bringing this action.

## JURISDICTION AND VENUE

5. This Court has jurisdiction pursuant to 5 U.S.C. section 552(a)(4)(B). That provision

of the FOIA grants jurisdiction to "the district court of the United States in the district in which the complainant resides or has his principal place of business[.]" 5 U.S.C. § 552(a)(4)(B). USRTK is a nonprofit public benefit corporation organized under the Nonprofit Public Benefit Corporation Law for charitable purposes. USRTK was incorporated in the State of California in May 2014. USRTK maintains its principal place of business in the Northern District of California.

6. This Court also has federal question jurisdiction pursuant to 28 U.S.C. section 1331 because this action arises under the FOIA and the Declaratory Judgment Act, 28 U.S.C. section 2201 *et seq*.

**INTRADISTRICT ASSIGNMENT**

7. Pursuant to Local Rule 3-2(c), this case is properly brought in the San Francisco Division of the Northern District of California, because a substantial part of the events and omissions which give rise to the claims alleged herein occurred in the County of San Francisco.

8. Under the FOIA, 5 U.S.C. § 522(a)(4)(B), jurisdiction vests in the district court where "the complainant resides" or "has his principal place of business."

9. Plaintiff has its principal place of business in the County of San Francisco.

10. As such, under the L.R. 3-2(c), (d), intradistrict assignment to the San Francisco division is proper.

**PARTIES**

11. Plaintiff USRTK is a 501(c)(3) nonprofit corporation organized under the laws of the State of California.

12. USRTK is a nonprofit newsroom and public health research group. USRTK investigates and reports on corporate wrongdoing and government failures that threaten our health, environment or food system.

13. Defendant HHS is an agency of the United States executive branch.

14. Defendant HHS qualifies as an "agency" under the FOIA, the records sought are "records" under the FOIA, and because Defendant HHS is in possession and control of the records sought by USRTK, the HHS is subject to the FOIA pursuant to 5 U.S.C. §552(f).

15. Defendant CDC is a division of the HHS and is one of the major operating

components of the HHS. https://www.cdc.gov/about/organization/.

16. Defendant CDC qualifies as an "agency" under the FOIA, the records sought are "records" under the FOIA, and because Defendant CDC is in possession and control of the records sought by USRTK, the CDC is subject to the FOIA pursuant to 5 U.S.C. §552(f).

17. The Defendant HHS and Defendant CDC, as an operating division of the HHS, are subject to the same rules and regulations regarding compliance with the FOIA. 45 C.F.R. §5.2.

**LEGAL FRAMEWORK**

18. The FOIA requires U.S. government agencies to "promptly" make public records available to any person if that person makes a request which (1) reasonably describes the records sought and (2) complies with any applicable agency rules for making such a request. 5 U.S.C. § 552(a)(3)(A).

19. The FOIA requires an agency to issue a final determination on any such information request within twenty business days from the date of its receipt. 5 U.S.C. § 552(a)(6)(A)(i). In issuing a final determination, an agency is required to inform the requester of three things: (1) the agency's determination of whether or not it must comply with the request; (2) the reasons for its decision; and (3) notice of the right of the requester to appeal to the head of the agency. 5 U.S.C. § 552(a)(6)(A)(i).

20. The FOIA allows an agency to extend the twenty-day determination deadline, however, by ten working days when "unusual circumstances" exist and when the agency so notifies a requester in writing. 5 U.S.C. § 552(a)(6)(B)(i)-(iii); 45 C.F.R. § 5.24(f). A notice informing a requester of the invocation of the "unusual circumstances" provision must specify the applicable "unusual circumstances." *Id*.

21. Permissible "unusual circumstances" are limited to: "(I) the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request; (II) the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or (III) the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components

of the agency having substantial subject-matter interest therein." 5 U.S.C. § 552(a)(6)(B)(iii).

22. An agency is entitled to one ten-business day extension. 5 U.S.C. § 552(a)(6)(B)(i). The written notice provided to the requester must specify the specific unusual circumstances justifying the extension and the date on which a final determination is expected to be dispatched. *Id.*; 45 C.F.R. § 5.24(f).

23. In some circumstances, the FOIA allows an agency to invoke an extension beyond ten days. To invoke a longer extension, the FOIA requires an agency to provide written notification to the requester that (1) offers the requester an opportunity to limit the scope of the request so that it may be processed within that time limit, or (2) offers the requester an opportunity to arrange with the agency an "alternative time frame" for processing the request. 5 U.S.C. § 552(a)(6)(B)(ii); 45 C.F.R. § 5.24(f).

24. As part of invoking an "alternative time frame" extension, the agency must also make available to the requester its FOIA Public Liaison, who is tasked to resolve any dispute between the requester and the agency. 5 U.S.C. § 552(a)(6)(B)(ii); 45 C.F.R. § 5.24(f).

25. FOIA Public Liaisons "shall serve as supervisory officials" and "shall be responsible for assisting in reducing delays, increasing transparency and understanding of the status of requests, and assisting in the resolution of disputes." 5 U.S.C. § 552(l).

26. Even when an "unusual circumstances" extension is made, the agency must still notify the requester of its expected date on which a final determination will be dispatched. 5 U.S.C. § 552(a)(6)(B)(i); 45 C.F.R. § 5.24(f) ("Whenever we cannot meet the statutory time limit for processing a request because of 'unusual circumstances,' as defined in the FOIA, and we extend the time limit on that basis, we will notify you, before expiration of the 20-day period to respond and in writing of the unusual circumstances involved and of the date by which we estimate processing of the request will be completed.").

27. "Exceptional circumstances" for failure to comply with applicable time limits "does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests." 5 U.S.C. § 552(a)(6)(C)(ii).

28. If an agency fails to provide a final determination on a FOIA request within the statutory timeframe, the requester is deemed to have exhausted its administrative remedies and may immediately file suit against the agency. 5 U.S.C. § 552(a)(6)(C)(i).

29. The FOIA also requires agencies to provide "an estimated date on which the agency will complete action on the request." 5 U.S.C. § 552(a)(7)(B)(ii); *see also* 5 U.S.C. § 552(a)(6)(B)(i).

30. Agencies shall make reasonable efforts to maintain their records so they are reproducible for FOIA purposes, and "shall make reasonable efforts to search" for responsive records. 5 U.S.C. § 552(a)(3)(B), (C). The term "search" "means to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request." 5 U.S.C. § 552(a)(3)(D).

31. In furnishing records responsive to a request under the FOIA, an agency may, for a limited set of categories of information, exclude or withhold such information from disclosure. 5 U.S.C. § 552(b). However, even where proper justification exists for withholding such information, the agency must provide the remaining portions of records that are reasonably segregable from the properly withheld portions thereof. *Id.*

32. Except in certain circumstances, when an agency produces a record in response to a FOIA request but withholds a portion thereof, the agency must indicate the volume of information withheld and the exemption under which such information has been withheld. *Id.*; 5 U.S.C. § 552(a)(6)(F).

33. An agency that withholds public records from a requestor under the FOIA bears the burden of sustaining the legality of its action. 5 U.S.C. § 552(a)(4)(B).

34. Requesters under the FOIA may ask that an agency waive fees associated with any request for records "if disclosure of the information is in the public interest because it is likely to contribute significantly to the public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

35. An agency may only charge certain fees depending on the category of requester. For non-commercial requesters such as USRTK, "fees shall be limited to reasonable standard charges

for document search and duplication." 5 U.S.C. § 552(a)(4)(A)(ii)(III).

36. Agencies are prohibited from assessing search fees if the agency fails to comply with the FOIA's twenty-day determination deadline or any lawful extension under the statute's "unusual circumstances" provisions. 5 U.S.C. § 552(a)(4)(A)(viii).

37. This Court has jurisdiction to enjoin the agencies from withholding agency records and to order the production of any agency records improperly withheld from the complainant, pursuant to 5 U.S.C. § 552(a)(4)(A)(i)(B).

## STATEMENT OF OPERATIVE FACTS

38. USRTK has a demonstrated track record of obtaining and disseminating information obtained under the FOIA and state public records laws concerning public health. Since 2015, USRTK has obtained, posted online, and reported on hundreds of thousands of pages of industry and government documents gathered via public records requests. USRTK's work has contributed to three New York Times investigations, 15 academic papers in public health journals, 13 articles in the BMJ, one of the world's leading medical journals, and global media coverage documenting how food and chemical corporations impact public health and the environment. USRTK's staff has expertise in investigative journalism and advanced research, especially as it concerns impacts on human health. (https://usrtk.org/about-u-s-right-to-know/).

39. USRTK is a member of the Institute for Nonprofit News, a network of more than 500 nonprofit news organizations dedicated to public service journalism.

40. USRTK's investigation of the origins of COVID-19 has been featured in news outlets around the world, including the Wall Street Journal, New York Times, Washington Post, USA Today, New Yorker, Vanity Fair, Science, the BMJ, Journal of Medical Ethics and many other outlets. (https://usrtk.org/about-u-s-right-to-know/).

41. In February 2025, USRTK received a James Madison Freedom of Information Award from the Society for Professional Journalists Northern California chapter. This award recognizes people and organizations that have made "significant contributions to advancing freedom of information and expression in the spirit of James Madison, the creative force behind the First Amendment." The award states in part that:

> By filing more than 160 requests under the Freedom of Information Act, initiating 30 lawsuits to uncover documents held by federal officials, and combing through tens of thousands of documents, U.S. Right to Know unearthed crucial information about the potential origins of COVID-19 and the high-risk research being conducted at the Wuhan Institute of Virology.

*See* Thomas Peele & Laura Wenus, *SPJ NORCAL Honors Transparency Champions in James Madison Freedom of Information Awards*, Society of Professional Journalists, Northern California, https://spjnorcal.org/2025/02/12/spj-norcal-honors-transparency-champions-in-james-madison-freedom-of-information-awards-3/ (last visited March 04, 2026).

42. USRTK shares its findings with media outlets, public health and medical journals, and through its own library of information, available online at: <https://www.usrtk.org>. Many of USRTK's documents are available through the USRTK Agrichemical Collection of the University of California, San Francisco's (UCSF) Chemical Industry Documents Archive, available online at: <https://www.industrydocuments.ucsf.edu/chemical/collections/usrtk-agrichemical-collection/>, and the USRTK Food Industry Collection of the UCSF Food Industry Documents Archive, available online at: <https://www.industrydocuments.ucsf.edu/food/collections/usrtk-food-industry-collection/.

## FOIA Request One

43. On September 6, 2024, USRTK submitted a two-part FOIA Request to the HHS (referred to herein as "Request One"). USRTK submitted Request One to the HHS by e-mailing Request One to Ms. Arianne Perkins, Freedom of Information Officer for the HHS, at the HHS address for submission of FOIA requests – FOIARequest@HHS.gov. Request One sought a waiver of all fees associated with processing the request. A true and accurate copy of Request One is attached hereto as **Exhibit A** and is incorporated by reference as though set forth in full herein.

44. Request One sought documents pertaining to certain former or then-current HHS employees who participated in the Potential Pandemic Pathogens Care and Oversight (P3CO) Committee at the HHS. **Exhibit A, pp. 1-2**. USRTK stated in Request One that the documents sought "…will provide U.S. Right to Know and the public with crucial insight into the activities of the HHS in relation to the US Government's efforts to regulate high risk research." **Exhibit A, pg.**

**4**.

45. USRTK did not receive any communications from the HHS following the submission of Request One.

46. On October 8, 2024, USRTK sent a letter to Ms. Arianne Perkins, stating that USRTK had not received an acknowledgment of Request One or information about when USRTK would receive an official “determination” on its request, as required by FOIA, 5 U.S.C. § 552(a)(6)(B)(i). The October 8, 2024, letter demanded that the HHS provide, within 10 business days, an official determination on Request One or, at the very least, a certain date by which USRTK should expect a determination. USRTK also asked that the HHS address USRTK’s request for a fee waiver in a timely manner. Finally, USRTK asked that the HHS provide an estimated completion date that complied with the FOIA's requirement to "promptly" make records available upon request.

47. USRTK did not receive any communications from the HHS following the submission of the October 8, 2024, letter.

48. On November 14, 2024, Plaintiff USRTK again sent a letter to Ms. Arianne Perkins, stating that USRTK has not received an acknowledgment of Request One or information about when USRTK would receive an official “determination” on its request, as required by FOIA, 5 U.S.C. § 552(a)(6)(B)(i). The October 8, 2024, letter demanded that the HHS provide, within 10 business days, an official determination on Request One or, at the very least, a certain date by which USRTK should expect a determination. USRTK also asked that the HHS address USRTK’s request for a fee waiver in a timely manner. Finally, USRTK asked that the HHS provide an estimated completion date that complied with the FOIA's requirement to "promptly" make records available upon request.

49. USRTK did not receive any communications from the HHS following the submission of the November 14, 2024, letter.

50. On December 29, 2025, counsel for Plaintiff USRTK, sent a letter to Ms. Perkins and to Ms. Karen Lampe, the Acting FOIA Officer at the National Institutes of Health. The December 29, 2025, letter was submitted by email to the FOIA submission email addresses for both the NIH and Defendant HHS, namely nihfoia@od.nih.gov and FOIARequest@HHS.gov.

51. The December 29, 2025, letter asked that, on or before January 9, 2026, the HHS and/or the NIH assign a FOIA Request number to Request One, make the formal determination required by both the FOIA and the Request for Determination submitted by USRTK on October 6, 2024, provide a date certain for the production of documents subject to Request One, and approve USRTK's Request for Fee Waiver.

52. Neither USRTK or USRTK's legal counsel ever received any communications from either the HHS or the NIH following the submission of the December 29, 2025, letter.

53. On January 26, 2026, counsel for USRTK sent an email to both Ms. Perkins and Ms. Lampe which referenced the December 29, 2025, letter, and stated that he had no record of receiving a response to that letter. The January 26, 2026, email stated that unless counsel for USRTK received a response on or before Monday, February 2, 2026, with the requested information, USRTK would have no choice but to seek all available remedies under law, including a request for the payment of attorneys' fees and costs.

54. Neither USRTK or USRTK's legal counsel ever received any communications from the HHS and the NIH following the submission of the January 26, 2026, email.

**FOIA Request Two**

55. On July 16, 2025, USRTK submitted a FOIA request to the HHS. This FOIA request is referred to herein as Request Two. USRTK submitted Request Two to the HHS by email to FOIARequest@hhs.gov. Request Two sought a waiver of all fees associated with processing the request. Request Two also included a request for expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E)(i) and 45 CFR 5.27 (A)(5)(B). A true and accurate copy of Request Two is attached hereto as **Exhibit B** and is incorporated by reference as though set forth in full herein.

56. Request Two sought copies of emails and attachments sent or received by HHS Secretary Alex Azar between November 1, 2019, and May 1, 2020, that were exchanged with certain individuals and/or email addresses or domains, relating to identified keywords pertaining to the origins of the Covid-19 virus. **Exhibit B, pp. 1-2**.

57. Request Two stated that the request would provide U.S. Right to Know and the public with crucial insight into the activities of the HHS about the US Government's efforts to

utilize information from foreign partners in understanding the origins of the COVID-19 pandemic. **Exhibit B, pg. 4**.

58. On July 17, 2025, USRTK received an Automatic Reply from OS FOIA Request (HHS/ASPA) from the email address FOIARequest@hhs.gov acknowledging receipt of Request Two and recommending that USRTK submit Request Two via the HHS Public Access Link (PAL).

59. On July 17, 2025, USRTK submitted Request Two via the HHS Public Access Link (PAL).

60. On July 17, 2025, the HHS sent an email to Lewis Kamb, Investigative Reporter at USRTK, acknowledging receipt of Request Two and assigning it Request #2025-03348-FOIA-OS. The email was sent from the HHS's FOIA email address FOIARequest@HHS.gov.

61. On July 17, 2025, the HHS sent an additional email to Mr. Kamb advising that the status of Request #2025-03348-FOIA-OS had been updated to the status of "Received." The email was sent from the HHS's FOIA email address FOIARequest@HHS.gov.

62. On October 1, 2025, Mr. Kamb sent an email to the HHS at FOIARequest@hhs.gov asking for an update on the status of FOIA #2025-03348-FOIA-OS.

63. The HHS did not respond to the October 1, 2025, request from Mr. Kamb for an update on the status of Request Two.

64. On October 11, 2025, USRTK sent a letter to Arianne Perkins at the Department of Health and Human Services Office of the Secretary, Freedom of Information Act Office. The October 11, 2025, letter was sent via email to the HHS's FOIA email address FOIARequest@hhs.gov.

65. The October 11, 2025, USRTK letter, stated that it was a determination request under the FOIA regarding Request Two. The October 11, 2025, USRTK letter demanded that, within 10 business days, the HHS provide an official determination on this request or, at the very least, a certain date by which USRTK should expect a determination. USRTK also asked that the HHS address its request for expedited processing and a fee waiver in a timely manner. Finally, USRTK asked that the HHS also provide an estimated completion date that complies with the FOIA's requirement to "promptly" make records available upon request.

66. On October 11, 2025, USRTK received an Automatic Reply from the HHS at FOIARequest@hhs.gov acknowledging receipt of USRTK's Request for Determination, as set forth in USRTK's October 11, 2025, letter to the HHS.

67. USRTK did not receive a response to its determination request other than the Automatic Reply from the HHS.

68. On December 30, 2025, legal counsel for USRTK, wrote to Karen Lampe, Acting FOIA Officer of the National Institutes of Health, and to Arianne Perkins, at the Department of Health and Human Services. Legal counsel's letter was submitted by email to both nihfoia@od.nih.gov and FOIARequest@HHS.gov.

69. The December 30, 2025, letter advised Defendant HHS of Greenfire Law PC's representation of USRTK concerning Request Two. The letter attached a copy of USRTK's Request Two. The letter asked that the HHS and/or the NIH take the following actions on or before Friday, January 9, 2026:

1. Make the formal determination required by both the FOIA and the Request for Determination submitted by U.S. Right to Know on October 11, 2025,
2. Approve U.S. Right to Know's Request for Expedited Processing,
3. Approve U.S. Right to Know's Request for Fee Waiver, and
4. Provide a date certain for the production of the documents subject to this FOIA Request.

70. Neither the HHS nor the NIH responded to the December 30, 2025, letter from counsel for USRTK to both the HHS and the NIH concerning Request Two.

71. On January 27, 2026, counsel for USRTK sent an email to both Ms. Lampe and Ms. Perkins at their official email addresses at nihfoia@od.nih.gov and FOIARequest@HHS.gov. .

72. The January 27, 2026, email to Ms. Lampe and Ms. Perkins attached a copy of the December 30, 2025, letter to both individuals from counsel for USRTK. The email stated that no response had been provided to the December 30, 2025, email. The January 27, 2026, email stated that unless counsel for USRTK received a response on or before February 2, 2026, with the information requested in the December 30, 2025, letter, USRTK would have no choice but to begin litigation proceedings against the appropriate agency for failure to comply with the FOIA. The

January 27, 2026, email stated that if litigation was necessary, USRTK would seek all available remedies under law, including a request for payment of attorneys' fees and costs.

73. Neither the HHS nor the NIH responded to the January 27, 2026, email from counsel for USRTK to both the HHS and the NIH concerning Request Two.

**FOIA Request Three**

74. On January 14, 2026, USRTK submitted a FOIA request to the CDC. This FOIA request is referred to herein as Request Three. USRTK submitted Request Three to the CDC by email to FOIARequest@hhs.gov. Although Request Three is dated November 19, 2025, it was submitted on January 14, 2026. Request Three sought a waiver of all fees associated with processing the request. Request Three also included a request for expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E)(i) and 45 CFR 5.27 (A)(5)(B). A true and accurate copy of Request Three is attached hereto as **Exhibit C** and is incorporated by reference as though set forth in full herein.

75. Request Three sought copies of the following records created or received between October 1, 2022, and August 31, 2023:

A. Written notifications, memoranda, reports, letters, emails (including attachments) and/or presentations sent from the University of Texas Medical Branch (UTMB) to the Centers for Disease Control and Prevention (CDC) regarding an unexpected phenotype (increased virulence/neurological symptoms in K18-hACE2 mice) observed in chimeric SARS-CoV-2 viruses supported in whole or in part by CDC funds (including, but not limited to, CDC grant numbers U01GH002091 / U01CK000512).

B. Written correspondence, emails (including attachments), memoranda, letters, reports and/or notes acknowledging receipt of the UTMB notification described in item #1 above, including correspondence involving Program Officer Amy Y. Yang, Ph.D., the Division of Vector-Borne Diseases, and/or the Division of High-Consequence Pathogens and Pathology.

C. Any CDC response and/or follow-up correspondence to UTMB concerning the experiments described in item #1 above, and/or the continuation of the funded work.

**Exhibit C, pg. 1**.

76. Request Three stated that the request would provide USRTK and the public with

crucial insights into potentially risky biomedical experiments that were partly funded and overseen by the CDC as part of scientific efforts nationwide to understand SARS-CoV-2 during the COVID pandemic. **Exhibit C, pg. 2**.

77. On January 14, 2026, USRTK received an Automatic Reply from OS FOIA Request (HHS/ASPA) from the email address FOIARequest@hhs.gov acknowledging receipt of Request Three, assigning confirmation ID 2688146 to Request Three and confirming that Request Three was being sent to the CDC.

78. USRTK did not receive any communications from the CDC between January 14, 2026, and March 6, 2026.

79. On March 6, 2026, USRTK sent a letter to Arianne Perkins, FOIA Officer, at the Centers for Disease Control and Prevention. The March 6, 2026, letter was sent via email to the CDC's FOIA email address FOIARequests@cdc.gov.

80. The March 6, 2026, USRTK letter, stated that it was a determination request under the FOIA regarding Request Three. The March 6, 2026, letter stated that the CDC had not provided a tracking number for Request Three. The March 6, 2026, letter also stated that the CDC had not provided USRTK with information as to when USRTK should expect to receive an official determination for Request Three, as required by the FOIA. The March 6, 2026, USRTK letter demanded that, within 10 business days, the CDC provide an official determination on Request Three or, at the very least, a certain date by which USRTK should expect a determination. USRTK also asked that the CDC address its request for expedited processing and a fee waiver in a timely manner. Finally, USRTK asked that the CDC also provide an estimated completion date that complies with the FOIA's requirement to "promptly" make records available upon request.

81. On March 6, 2026, USRTK received an Automatic Reply from the CDC at FOIARequests@cdc.gov acknowledging receipt of USRTK's Request for Determination, as set forth in USRTK's March 6, 2026, letter to the CDC.

82. USRTK did not receive a response to its determination request other than the Automatic Reply from the CDC.

83. On April 13, 2026, legal counsel for USRTK, wrote to both Paula Formosa, FOIA

Public Liaison, and to Arianne Perkins, at the CDC. This letter was submitted by email to FOIARequest@HHS.gov.

84. The April 13, 2026, letter advised both the HHS and the CDC of Greenfire Law PC's representation of USRTK concerning Request Three. The letter attached a copy of USRTK's Request Three. The letter asked that the CDC take the following actions within twenty (20) calendar dates of the letter:

A. Make the formal determination required by both the FOIA and the Request for Determination submitted by U.S. Right to Know for Request Three,

B. Approve U.S. Right to Know's Request for Expedited Processing,

C. Approve U.S. Right to Know's Request for Fee Waiver, and

D. Provide a date certain for the production of the documents subject to this FOIA Request.

85. The CDC did not respond to the April 13, 2026, letter from counsel for USRTK to the CDC concerning Request Three.

86. On May 18, 2026, counsel for USRTK sent an email to both Ms. Formosa and Ms. Perkins at their official email address at FOIARequest@HHS.gov.

87. The May 18, 2026, email to Ms. Lampe and Ms. Perkins attached a copy of the April 13, 2026, letter to both individuals from counsel for USRTK. The email stated that no response had been provided to the April 13, 2026, letter from counsel for USRTK. The May 18, 2026, email stated that unless counsel for USRTK received a response on or before May 27, 2026, with the information requested in the April 13, 2026, letter, USRTK would have no choice to take steps to initiate formal proceedings to obtain the requested documents.

88. The CDC never responded to the May 18, 2026, email from counsel for USRTK to the CDC regarding Request Three.

## CAUSES OF ACTION

### COUNT I

**Violations of the Freedom of Information Act:**
**Failure to Provide Timely Final Determination**

89. The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

90. USRTK has a statutory right to have the HHS process its FOIA requests in a manner that complies with the FOIA. USRTK's rights in this regard were violated by the HHS's failure to provide a timely and legally adequate final determination for Request One and Request Two.

91. USRTK has a statutory right to have the CDC process its FOIA requests in a manner that complies with the FOIA. USRTK's rights in this regard were violated by the CDC's failure to provide a timely and legally adequate final determination for Request Three.

92. As of the date that this First Amended Complaint is being filed, approximately a year and a half after USRTK submitted Request One and approximately one year after USRTK submitted Request Two, USRTK has not received any written communication from the HHS about whether the Agency will comply with the FOIA Requests, the HHS's reasons for making that decision, and any right of USRTK to administratively appeal that decision. 5 U.S.C. § 552(a)(6)(A)(i); 45 C.F.R. Part 5.

93. As of the date that this First Amended Complaint is being filed, approximately six months after USRTK submitted Request Three USRTK has not received any written communication from the CDC about whether the Agency will comply with the FOIA Requests, the CDC's reasons for making that decision, and any right of USRTK to administratively appeal that decision. 5 U.S.C. § 552(a)(6)(A)(i); 45 C.F.R. Part 5.

94. Based on the nature of USRTK's organizational activities, USRTK will continue to employ the FOIA's provisions to request information from both the HHS and the CDC in the foreseeable future. These activities will be adversely affected if the HHS and the CDC are allowed to continue violating the FOIA's response deadlines.

95. Unless enjoined and made subject to a declaration of USRTK's legal rights by this Court, the HHS and the CDC will continue to violate USRTK's rights to receive public records under the FOIA.

96. The HHS's failure to make a final determination on the FOIA Request One and FOIA Request Two within the statutory timeframe has prejudiced USRTK's ability to timely obtain public records.

97. The CDC's failure to make a final determination on the FOIA Request Three within

the statutory timeframe has prejudiced USRTK's ability to timely obtain public records.

**COUNT II**

**Violation of the Freedom of Information Act:
Unlawful Withholding of Non-Exempt Public Records**

98. The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

99. USRTK has a statutory right to have the HHS and its division the CDC process its FOIA requests in a manner that complies with the FOIA. USRTK's rights in this regard were violated when the HHS and the CDC failed to promptly provide public, non-exempt records to USRTK in response to the three FOIA Requests, 5 U.S.C. §§ 552(a)(3)(A) & (b), to provide a reasonable estimate of the volume of withheld records, 5 U.S.C. § 552(a)(6)(F), and to reasonably segregate all non-exempt portions of otherwise exempt material, 5 U.S.C. § 552(b).

100. The HHS and the CDC are unlawfully withholding public disclosure of information sought by USRTK, information to which it is entitled and for which no valid disclosure exemption applies.

101. USRTK has constructively exhausted its administrative remedies with respect to Request One, Request Two and Request Three.

102. USRTK is entitled to injunctive relief to compel production of all non-exempt, responsive records.

103. Based on the nature of USRTK's organizational activities, USRTK will undoubtedly continue to employ FOIA's provisions to request information from the HHS and the CDC in the foreseeable future.

USRTK's organizational activities will be adversely affected if the HHS and the CDC are allowed to continue violating FOIA's response deadlines as it has in this case.Unless enjoined and made subject to a declaration of USRTK's legal rights by this Court, the HHS and the CDC will continue to violate the rights of USRTK to receive public records under the FOIA.

## COUNT III

### Violation of the Freedom of Information Act: Failure to Provide Estimated Date of Completion

104. The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

105. USRTK has a statutory right to have the HHS process FOIA Request One and FOIA Request Two in a manner that complies with the FOIA. USRTK's rights in this regard were violated by the HHS's unlawful failure to provide an estimated date of completion for Request One and Request Two as required by the FOIA, 5 U.S.C. § 552(a)(7)(B)(ii).

106. USRTK formally requested that the HHS provide an estimated date of completion for both Request One and Request Two. No such date was provided by the HHS.

107. USRTK has a statutory right to have the CDC process FOIA Request Three in a manner that complies with the FOIA. USRTK's rights in this regard were violated by the CDC's unlawful failure to provide an estimated date of completion for Request Three as required by the FOIA, 5 U.S.C. § 552(a)(7)(B)(ii).

108. USRTK formally requested that the CDC provide an estimated date of completion for Request Three. No such date was provided by the CDC.

109. Based on the nature of USRTK's organizational activities, USRTK will continue to employ FOIA's provisions to request information from the HHS in the foreseeable future. These activities will be adversely affected if the HHS is allowed to continue violating the FOIA's requirements for providing USRTK with an estimated date of completion on FOIA Request One and FOIA Request Two.

110. Based on the nature of USRTK's organizational activities, USRTK will continue to employ FOIA's provisions to request information from the CDC in the foreseeable future. These activities will be adversely affected if the CDC is allowed to continue violating the FOIA's requirements for providing USRTK with an estimated date of completion on FOIA Three.

111. Unless enjoined and made subject to a declaration of USRTK's legal rights by this Court, the HHS will continue to violate the rights of USRTK to receive public records under the

FOIA.

112. Unless enjoined and made subject to a declaration of USRTK's legal rights by this Court, the CDC will continue to violate the rights of USRTK to receive public records under the FOIA.

**REQUEST FOR RELIEF**

THEREFORE, USRTK prays that this Court:

1. Order Defendant HHS to promptly provide USRTK all the information sought in this action and to immediately disclose the requested records for Request One and Request Two in unredacted format unless an exemption is properly claimed and properly applies.

2. Declare Defendant HHS's failure to provide USRTK with a final determination for Request One and Request Two as unlawful under the FOIA.

3. Declare Defendant HHS's failure to promptly provide USRTK with all non-exempt records responsive to Request One and Request Two as unlawful under the FOIA.

4. Declare Defendant HHS's failure to provide USRTK with an estimated date of completion for Request One and Request Two, as required by 5 U.S.C. § 552(a)(7)(B)(ii), unlawful under the FOIA.

5. Order Defendant CDC to promptly provide USRTK all the information sought in this action and to immediately disclose the requested records for Request Three in unredacted format unless an exemption is properly claimed and properly applies.

6. Declare Defendant CDC's failure to provide USRTK with a final determination for Request Three as unlawful under the FOIA.

7. Declare Defendant CDC's failure to promptly provide USRTK with all non-exempt records responsive to Request Three as unlawful under the FOIA.

8. Declare Defendant CDC's failure to provide USRTK with an estimated date of completion for Request Three, as required by 5 U.S.C. § 552(a)(7)(B)(ii), unlawful under the FOIA.

9. Award USRTK its reasonable attorneys' fees and costs pursuant to 5 U.S.C. § 552(a)(4)(E) and/or 28 U.S.C. § 2412.

10. Grant such other and further relief to USRTK as the Court may deem just and

proper.

Dated: October 13, 2026

Respectfully Submitted,

By: */s/ Lily A. Rivo*

Jessica L. Blome
Lily A. Rivo
Richard A. Brody
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
Telephone: (510) 900-9502
Email: jblome@greenfirelaw.com
lrivo@greenfirelaw.com
rbrody@greenfirelaw.com

*Attorneys for Plaintiff U.S. Right to Know*

# EXHIBIT A

U.S. RIGHT TO KNOW
*Pursuing truth and transparency for public health*

September 6, 2024

Arianne Perkins
Department of Health and Human Services
Freedom of Information Act Office
Hubert H. Humphrey Building, Room 729H
200 Independence Avenue SW
Washington, DC 20201

Via email: FOIARequest@hhs.gov

**RE: Freedom of Information Act request**

Dear Ms. Perkins:

This is a two-part request under the Freedom of Information Act, 5 U.S.C. § 552, et seq., to the U.S. Department of Health and Human Services (HHS).

We request documents pertaining to the following former or current HHS employees who participated in the Potential Pandemic Pathogens Care and Oversight (P3CO) review committee:

- Carrie Wolinetz, former Chief of Staff, National Institutes of Health (NIH)
- David J. Spiro, Director of the Division of International Epidemiology and Population Studies, Fogarty International Center (FIC), NIH
- Irene Glowinski, Former Deputy Director, National Institute of Allergy and Infectious Diseases (NIAID), NIH
- Dennis Dixon, Chief, Bacteriology and Mycology Branch, NIAID
- Andrew Ford, Policy and Strategic Planning Team Lead, NIAID
- Teresa Hauguel, former Acting Chief, Respiratory Diseases Branch, NIAID
- Linda Lambert, former Deputy Director, Biomedical Advanced Research and Development Authority (BARDA), HHS

**Part I.** We request all meeting minutes for the P3CO review committee or gain of function research of concern meeting from January 1, 2017 to December 31, 2019.

Senator Rand Paul's office has confirmed the existence of this weekly meeting. The relevant pages of the hearing transcript are attached to this request (Attachment #1).

**Part II.** We seek all communications by letter or email to or from the above employees (including CC and BCC, and their attachments) containing the following keywords:

- “SARS coronavirus”
- “Spike” AND “furin”
- “ACE2”
- “P3CO”
- Gain of function OR “GOF” (in all capital letters)
- “Dual use research of concern” OR “Dual-use research of concern” OR “DURC”

The time frame of Part II of this request is from January 1, 2017 to December 31, 2019.

We request that you disclose these documents and materials as they become available to you, without waiting until all the documents have been assembled. If documents are denied in whole or in part, please specify which exemption(s) is (are) claimed for each passage or whole document denied. Give the number of pages in each document and the total number of pages pertaining to this request and the dates of documents withheld. We request that excised material be "blacked out" rather than "whited out" or cut out and that the remaining non-exempt portions of documents be released as provided under the Freedom of Information Act.

Please advise of any destruction of records and include the date of and authority for such destruction. As we expect to appeal any denials, please specify the office and address to which an appeal should be directed.

**REQUEST FOR FEE WAIVER**

FOIA was designed to provide citizens a broad right to access government records. FOIA's basic purpose is to "open agency action to the light of public scrutiny," with a focus on the public's "right to be informed about what their government is up to." *NARA v. Favish*, 541 U.S. 157, 171 (2004) quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773-74 (1989) (internal quotation and citations omitted). In order to provide public access to this information, FOIA's fee waiver provision requires that "[d]ocuments shall be furnished without any charge or at a [reduced] charge," if the request satisfies the standard. 5 U.S.C. § 552(a)(4)(A)(iii). FOIA's fee waiver requirement is "liberally construed." *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1310 (D.C. Cir. 2003); *Forest Guardians v. U.S. Dept. of Interior*, 416 F.3d 1173, 1178 (10th Cir. 2005).

The 1986 fee waiver amendments were designed specifically to provide non-profit organizations such as U.S. Right to Know access to government records without the payment of fees. Indeed, FOIA's fee waiver provision was intended "to prevent government agencies from using high fees to discourage certain types of requesters and requests," which are "consistently associated with requests from journalists, scholars, and *non-profit public interest groups*." *Ettlinger v. FBI*, 596 F. Supp. 867, 872 (D. Mass. 1984) (emphasis added). As one Senator stated, "[a]gencies should not be allowed to use fees as an offensive weapon against requesters seeking access to Government information ... ." 132 Cong. Rec. S. 14298 (statement of Senator Patrick Leahy).

**I. U.S. Right to Know Qualifies for a Fee Waiver.**

Under FOIA, a party is entitled to a fee waiver when "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the [Federal] government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

Thus, the HHS must consider six factors to determine whether a request is in the public interest: (1) whether the subject of the requested records concerns "the operations or activities of the Federal government," (2) whether the disclosure is "likely to contribute" to an understanding of government operations or activities, (3) whether the disclosure "will contribute to public understanding" of a reasonably broad audience of persons interested in the subject, (4) whether the disclosure is likely to contribute "significantly" to public understanding of government operations or activities. *Id*. § 2.107(1)(2), (5) whether a commercial interest exists and its magnitude, and (6) the primary interest in disclosure. As shown below, U.S. Right to Know meets each of these factors.

**A. The Subject of This Request Concerns "The Operations and Activities of the Government."**

The subject matter of this request concerns the operations and activities of the HHS. This request is about the HHS's knowledge of high-risk research of concern as it relates to the origins of the COVID-19 pandemic.

This FOIA will provide U.S. Right to Know and the public with crucial insight into the activities of the HHS in relation to the US Government's efforts to regulate high risk research. It is clear that a federal agency's oversight of health, safety and security threats, both foreign and in the U.S. is a specific and identifiable activity of the government, and in this case it is the executive branch agency of the HHS. *Judicial Watch*, 326 F.3d at 1313 ("[R]easonable specificity is all that FOIA requires with regard to this factor") (internal quotations omitted). Thus, U.S. Right to Know meets this factor.

**B. Disclosure is "Likely to Contribute" to an Understanding of Government Operations or Activities.**

The requested records are meaningfully informative about government operations or activities and will contribute to an increased understanding of those operations and activities by the public.

Disclosure of the requested records will allow U.S. Right to Know to convey to the public information about the HHS's activities in relation to gain-of-function experiments and dual-use research of concern. Once the information is made available, U.S. Right to Know will analyze it and present it to the general public in a manner that will meaningfully enhance the public's understanding of this topic.

Thus, the requested records are likely to contribute to an understanding of the HHS's operations and activities.

**C. Disclosure of the Requested Records Will Contribute to a Reasonably Broad Audience of Interested Persons' Understanding of the HHS's oversight of high-risk research**

The requested records will contribute to public understanding of whether the HHS's actions concerning high-risk research were consistent with its mission and purpose to "provide objective oversight to promote the economy, efficiency, effectiveness, and integrity of HHS programs, as well as the health and welfare of the people they serve." As explained above, the records will contribute to public understanding of this topic.

Activities of the HHS generally, and specifically its activities to regulate research involving the manipulation of high-risk pathogens are areas of interest to a reasonably broad segment of the public. U.S. Right to Know will use the information it obtains from the disclosed records to educate the public at large about this topic. *See W. Watersheds Proj. v. Brown*, 318 F. Supp.2d 1036, 1040 (D. Idaho 2004) (finding that "WWP adequately specified the public interest to be

served, that is, educating the public about the ecological conditions of the land managed by the BLM and also how ... management strategies employed by the BLM may adversely affect the environment").

Through U.S. Right to Know's synthesis and dissemination (by means discussed in Section II, below), disclosure of information contained in and gleaned from the requested records will contribute to a broad audience of persons who are interested in the subject matter. *Ettlinger v. FBI*, 596 F. Supp. at 876 (benefit to a population group of some size distinct from the requester alone is sufficient); *Carney v. Dept. of Justice*, 19 F.3d 807, 815 (2d Cir. 1994), *cert. denied*, 513 U.S. 823 (1994) (applying "public" to require a sufficient "breadth of benefit" beyond the requester's own interests); *Cmty. Legal Servs. v. Dep't of Hous. & Urban Dev.*, 405 F. Supp.2d 553, 557 (E.D. Pa. 2005) (in granting fee waiver to community legal group, court noted that while the requester's "work by its nature is unlikely to reach a very general audience," "there is a segment of the public that is interested in its work").

Indeed, the public does not currently have an ability to easily evaluate the requested records, which are not currently in the public domain. *See Cmty. Legal Servs.*, 405 F. Supp.2d at 560 (because requested records "clarify important facts" about agency policy, "the CLS request would likely shed light on information that is new to the interested public."). As the Ninth Circuit observed in *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1286 (9th Cir. 1987), "[FOIA] legislative history suggests that information [has more potential to contribute to public understanding] to the degree that the information is new and supports public oversight of agency operations... ."1[1]

Disclosure of these records is not only "likely to contribute," but is certain to contribute, to public understanding of HHS's activities toward regulating high-risk virology research. The public is always well served when it knows how the government conducts its activities. Hence, there can be no dispute that disclosure of the requested records to the public will educate the public about this pressing issue.

## II. Disclosure is Likely to Contribute Significantly to Public Understanding of Government Operations or Activities.

U.S. Right to Know is not requesting these records merely for their intrinsic informational value. Disclosure of the requested records will significantly enhance the public's understanding of what the HHS knows about the gain-of-function and dual-use research, as compared to the level of public understanding that existed prior to the disclosure. The records are also certain to shed light on the HHS's compliance with its own mission and purpose. Such public oversight of agency action is vital to our democratic system and clearly envisioned by the drafters of the FOIA. Thus, U.S. Right to Know meets this factor as well.

## III. Obtaining the Requested Records is of No Commercial Interest to U.S. Right to Know

Access to government records, disclosure forms, and similar materials through FOIA requests is essential to U.S. Right to Know's role of educating the general public. Founded in 2014, U.S. Right to Know is a 501(c)(3) nonprofit public interest, public health organization (EIN: 46-5676616). U.S. Right to Know has no commercial interest and will realize no commercial benefit from the release of the requested records.

**IV. U.S. Right to Know's Primary Interest in Disclosure is the Public Interest.**

As stated above, U.S. Right to Know has no commercial interest that would be furthered by disclosure. Although even if it did have an interest, the public interest would far outweigh any pecuniary interest.[1]

U.S. Right to Know is a non-profit organization that informs, educates, and counsels the public regarding corporate wrongdoing and government failures that threaten the integrity of our food system, our environment and our health. U.S. Right to Know has been substantially involved in the activities of numerous government agencies for over eight years, and has consistently displayed its ability to disseminate information granted to it through FOIA.

In granting U.S. Right to Know's fee waivers, agencies have recognized: (1) that the information requested by U.S. Right to Know contributes significantly to the public's understanding of the government's operations or activities; (2) that the information enhances the public's understanding to a greater degree than currently exists; (3) that U.S. Right to Know possesses the expertise to explain the requested information to the public; (4) that U.S. Right to Know possesses the ability to disseminate the requested information to the general public; (5) and that the news media recognizes U.S. Right to Know as an established expert in the field of public health. U.S. Right to Know's track record of active participation in oversight of governmental activities and decision making, and its consistent contribution to the public's understanding of those activities as compared to the level of public understanding prior to disclosure are well established.

U.S. Right to Know intends to use the records requested here similarly. U.S. Right to Know's work appears frequently in news stories online and in print, radio and TV, including reporting in outlets such as *The New York Times* and *The Guardian*, as well as medical and public health journals such as the *BMJ*. Many media outlets have reported about the food and chemical industries using information obtained by U.S. Right to Know from federal agencies. In 2023, nearly 500,000 people visited U.S. Right to Know's extensive website, and viewed pages more than 760,000 times. U.S. Right to Know and its staff regularly tweet to a combined following of more than 75,000 on Twitter, and 10,000 people follow U.S. Right to Know on Facebook. U.S. Right to Know intends to use any or all of these media outlets to share with the public information obtained as a result of this request.

---

[1] In this connection, it is immaterial whether any portion of U.S. Right to Know's request may currently be in the public domain because U.S. Right to Know requests considerably more than any piece of information that may currently be available to other individuals. *See Judicial Watch*, 326 F.3d at 1315.

Public oversight and enhanced understanding of the HHS's duties is absolutely necessary. In determining whether disclosure of requested information will contribute significantly to public understanding, a guiding test is whether the requester will disseminate the information to a reasonably broad audience of persons interested in the subject. *Carney*, 19 F.3d 807. U.S. Right to Know need not show how it intends to distribute the information, because "[n]othing in FOIA, the [agency] regulation, or our case law require[s] such pointless specificity." *Judicial Watch*, 326 F.3d at 1314. It is sufficient for U.S. Right to Know to show how it distributes information to the public generally. *Id.*

Please send the documents electronically in PDF format to Emily Kopp at emily@usrtk.org. If you need additional information please call, rather than write, Emily at (770) 789-4628.

Thank you so much for your help in filling this request.

Sincerely,

Emily Kopp
Investigative Reporter

Hana Mensendiek
Investigator

Gary Ruskin
Executive Director

Uh Dr. Parker, you've had a long distinguished careers. Have you ever directed any of your employees to take down fellow scientists who you disagreed with?

GERALD PARKER:

No.

RAND PAUL:

Dr. Redfield, you've had a long and distinguished career. Have you ever um, directed any of your employees to take down scientists who you had a disagreement with?

ROBERT REDFIELD:

No.

RAND PAUL:

Dr. Esvelt, same question?

KEVIN ESVELT:

No.

RAND PAUL:

Dr. Wolinetz, um, did you attend the gain of function dual use research of concern meetings during your tenure in government?

CARRIE WOLINETZ:

Yes.

RAND PAUL:

Were you considered to be a member?

CARRIE WOLINETZ:

A member of what specifically, senator?

RAND PAUL:

I don't know. Is there -- is there a group called that? Is it a meeting? Who gets to go? Were you -
-

CARRIE WOLINETZ:
So I participated in many groups inside governments in which biosecurity, management of dual use research, so --

RAND PAUL:
Right. This is a very specific meeting, though. This is the week -- it's called in this email weekly dual use research of concern, gain of function meeting. Uh, did you attend those routinely?

CARRIE WOLINETZ:
I don't recall a meeting called that, although it's quite possible I was -- was involved. That name doesn't ring a bell.

RAND PAUL:
This would be a meeting to discuss things that might be gain of function. Did you attend those meetings?

CARRIE WOLINETZ:
Uh, um, not if they were meetings at the level of an individual NIH institute to review research. I was not at all involved in that process.

RAND PAUL:
This is an email, it's from Theresa, I don't know how you pronounce it, Hagwell -- Hogwell. How -- do you know how to say it? HAUGUEL? And it's to -- Let's see an Irene Glowinski, Dennis Dixon, Linda Lambert, David Spiro. Are you familiar with those names?

CARRIE WOLINETZ:
I believe those are all employees of NIAID.

RAND PAUL:
OK. So you think this meeting may have occurred within NIAID and you might not have participated in it?

CARRIE WOLINETZ:
Yes, that's correct.

RAND PAUL:

OK. Um, are you surprised that when I ask for the debate over what is and what is not because there's a debate over what is the definition of gain of function that the NIH still refuses to give me minutes of these meetings or any of the discussion concerning what is gain of function and what is not gain of function?

CARRIE WOLINETZ:
I can't speak to NIH's decision.

RAND PAUL:
Do you think that's an appropriate policy for the NIH to refuse to give members of Congress the debate over whether something is or is not gain of function?

CARRIE WOLINETZ:
My general philosophy at NIH was to always be as cooperative with members of Congress as humanly possible.

RAND PAUL:
Your boss, not so much when he was -- he was -- before that, when he wasn't busy taking down fellow scientific colleagues. Dr. Parker, do you think it's appropriate for the NIH to refuse to give Congress the minutes or deliberations over what is or what is not gain of function, particularly concerning research that was done in Wuhan?

GERALD PARKER:
Inappropriate.

RAND PAUL:
Dr. Redfield, do you think the NIH should release -- do you think it's inappropriate that they won't release and should they release the information concerning the deliberations over gain of function?

ROBERT REDFIELD:
Yeah, I think it's inappropriate that they don't share that information.

RAND PAUL:
Dr. Esvelt, do you think it's inappropriate that the NIH continues to refuse to reveal information considering the deliberations over gain of function?

KEVIN ESVELT:

I think transparency is essential to public trust in science. And I think NIH has a duty to uphold public trust in science insofar as possible.

RAND PAUL:

The public needs to realize that I only know of this meeting existing because of a Freedom of Information Act. The Senate, groups of senators, the ranking member of a committee and they will not reveal they even have the meeting much less the minutes of the meeting. I can get more information from the CIA than the NIH. Dr. Redfield, do you think that damages science when the science are acting like the CIA and not revealing information, does it damage our trust in science?

ROBERT REDFIELD:

I think it's going to be very hard for public trust to be regained, you know, at NIH, CDC, FDA uh, from what we experienced in the COVID pandemic.

RAND PAUL:

Dr. Redfield, do you think, and we talked a little bit about this before, but taking the backbone of a SARS virus and adding various S proteins from other unknown viruses to see what you get running through that through serial passage, should that have gone before some sort of gain of function, um, review, even if it -- you know, to figure out whether it meets a definition of dangerous research?

ROBERT REDFIELD:

Yes.

RAND PAUL:

One of Anthony Fauci's responses has been -- well, there are two animal viruses and we don't know that they will infect humans. But by the time you combine them, the test they do is they actually test them to see if they infect human cells after they're done manipulating them. So their goal really is to see, hey, guys, do you think we can make it more infectious.

And yet they say and they hide behind definitions of well, we didn't know in advance. And this becomes -- becomes the problem. And look, I come from a scientific background, I'm aware of CRISPR technology, not enough to do it, but aware of the -- the great benefits of science. I'm aware of creating bacteria that make insulin.

# EXHIBIT B

U.S. RIGHT TO KNOW
*Pursuing truth and transparency for public health*

July 16, 2025

FOIA Officer
U.S. Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201

**Submitted via email to FOIARequest@hhs.gov**

**RE: Freedom of Information Act request**

Dear FOIA Officer:

This is a request under the Freedom of Information Act (5 U.S.C. § 552). I respectfully request copies of records capturing the communications of the former Health and Human Services Secretary during the early stages of the COVID-19 pandemic, containing discussions about the origins and early stages of the outbreak.

Please search for emails, including those with any carbon copy (cc) and blind carbon copy (bcc), and attachments, sent or received by HHS Secretary Alex Azar (including communications sent to or from his official department address Alex.Azar@hhs.gov) between November 1, 2019, and May 1, 2020, that were exchanged with any of the following individuals or email addresses/domains:

- Anthony Fauci
    - afauci@niaid.nih.gov
    - af10r@nih.gov
    - anthony.fauci@nih.gov
    - anthony.fauci@nih.hhs.gov
- Francis Collins
    - collinsf@mail.nih.gov

- Christopher Ford
  - FordCA@state.gov
- Robert Kadlec
  - Robert.Kadlec@hhs.gov
- Robert Redfield
  - olx1@cdc.gov
- Deborah Birx
  - deborah.birx@gmail.com
  - dbirx@whitehouse.gov
  - deborah.birx@who.eop.gov
- Katherine L. O'Brien
  - obrienk@who.int
- Matthew Pottinger
  - mpottinger@eop.who.gov
  - matthew.pottinger@eop.who.gov

Please limit your search to only emails or email threads that contain one or more of the following keywords in the subject line or message body (including attachments):

- "nCoV"
- "SARS" AND "origin"
- "COVID" AND "origin"
- "furin"
- "leak"
- "accident"
- "Incident"

We request that you disclose these documents and materials as they become available to you, without waiting until all the documents have been assembled. If documents are denied in whole or in part, please specify which exemption(s) is (are) claimed for each passage or whole document denied. Give the number of pages in each document and the total number of pages about this request, and the dates of documents withheld. We request that excised material be "blacked out" rather than "whited out" or cut out and that the remaining non-exempt portions of documents be released as provided under the Freedom of Information Act.

Please advise of any destruction of records and include the date of and authority for such destruction.

**REQUEST FOR FEE WAIVER**

FOIA was designed to provide citizens with a broad right to access government records. FOIA's basic purpose is to "open agency action to the light of public scrutiny," with a focus on the public's "right to be informed about what their government is up to." *NARA v. Favish*, 541 U.S. 157, 171 (2004) quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773- 74 (1989) (internal quotation and citations omitted). To provide public access to this information, FOIA's fee waiver provision requires that "[d]ocuments shall be furnished without any charge or at a [reduced] charge," if the request satisfies the standard. 5 U.S.C. § 552(a)(4)(A)(iii). FOIA's fee waiver requirement is "liberally construed." *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1310 (D.C. Cir. 2003); *Forest Guardians v. U.S. Dept. of Interior*, 416 F.3d 1173, 1178 (10th Cir. 2005).

The 1986 fee waiver amendments were designed specifically to provide non-profit organizations, such as U.S. Right to Know, access to government records without the payment of fees. Indeed, FOIA's fee waiver provision was intended "to prevent government agencies from using high fees to discourage certain types of requesters and requests," which are "consistently associated with requests from journalists, scholars, and *non-profit public interest groups*." *Ettlinger v. FBI*, 596 F. Supp. 867, 872 (D. Mass. 1984) (emphasis added). As one Senator stated, "[a]gencies should not be allowed to use fees as an offensive weapon against requesters seeking access to Government information ... ." 132 Cong. Rec. S. 14298 (statement of Senator Patrick Leahy).

**I. U.S. Right to Know Qualifies for a Fee Waiver.**

Under FOIA, a party is entitled to a fee waiver when "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the [Federal] government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

Thus, the HHS must consider six factors to determine whether a request is in the public interest: (1) whether the subject of the requested records concerns "the operations or activities of the Federal government," (2) whether the disclosure is "likely to contribute" to an understanding of government operations or activities, (3) whether the disclosure "will contribute to public understanding" of a reasonably broad audience of persons interested in the subject, (4) whether the disclosure is likely to contribute "significantly" to public understanding of government operations or activities. *Id*. § 2.107(1)(2), (5) whether a commercial interest exists and its magnitude, and (6) the primary interest in disclosure. As

shown below, U.S. Right to Know meets each of these factors.

**A. The Subject of This Request Concerns "The Operations and Activities of the Government."**

The subject matter of this request concerns the operations and activities of the HHS. This request is about the HHS Secretary's knowledge of intelligence about the origins of the COVID-19 pandemic.

This FOIA will provide U.S. Right to Know and the public with crucial insight into the activities of the HHS about the US Government's efforts to utilize information from foreign partners in understanding the origins of the COVID-19 pandemic. It is clear that a federal agency's oversight of health, safety and security threats, both foreign and in the U.S., is a specific and identifiable activity of the government, and in this case, it is the executive branch agency of the HHS. *Judicial Watch*, 326 F.3d at 1313 ("[R]easonable specificity is all that FOIA requires about this factor") (internal quotations omitted). Thus, U.S. Right to Know meets this factor.

**B. Disclosure is "Likely to Contribute" to an Understanding of Government Operations or Activities.**

The requested records are meaningfully informative about government operations or activities and will contribute to an increased understanding of those operations and activities by the public.

Disclosure of the requested records will allow U.S. Right to Know to convey to the public information about the HHS's activities related to intelligence its secretary received on the origins of COVID-19. Once the information is made available, U.S. Right to Know will analyze it and present it to the general public in a manner that will meaningfully enhance the public's understanding of this topic.

Thus, the requested records are likely to contribute to an understanding of the HHS's operations and activities.

**C. Disclosure of the Requested Records Will Contribute to a Reasonably Broad Audience of Interested Persons' Understanding of the Origins of the COVID-19 Pandemic**

The requested records will contribute to public understanding of whether the HHS's actions relating to finding origins of COVID-19 were consistent with its mission to "to enhance the health and well-being of all Americans, by providing for effective health and human services and by fostering sound, sustained advances in the sciences underlying medicine, public health, and social services." As explained above, the records will contribute to public understanding of this topic.

Activities of the HHS generally, and specifically its Secretary's decision-making, formed based on the origins of the COVID-19 pandemic by using available intelligence from both federal intelligence agencies and international networks, are areas of interest to a reasonably broad segment of the public. U.S. Right to Know will use the information it obtains from the disclosed records to educate the public at large about this topic. *See W. Watersheds Proj. v. Brown*, 318 F. Supp.2d 1036, 1040 (D. Idaho 2004) (finding that "WWP adequately specified the public interest to be served, that is, educating the public about the ecological conditions of the land managed by the BLM and also how ... management strategies employed by the BLM may adversely affect the environment").

Through U.S. Right to Know's synthesis and dissemination (by means discussed in Section II, below), disclosure of information contained in and gleaned from the requested records will contribute to a broad audience of persons who are interested in the subject matter. *Ettlinger v. FBI*, 596 F. Supp. at 876 (benefit to a population group of some size distinct from the requester alone is sufficient); *Carney v. Dept. of Justice*, 19 F.3d 807, 815 (2d Cir. 1994), *cert. denied*, 513 U.S. 823 (1994) (applying "public" to require a sufficient "breadth of benefit" beyond the requester's own interests); *Cmty. Legal Servs. v. Dep't of Hous. & Urban Dev.*, 405 F. Supp.2d 553, 557 (E.D. Pa. 2005) (in granting fee waiver to community legal group, court noted that while the requester's "work by its nature is unlikely to reach a very general audience," "there is a segment of the public that is interested in its work").

Indeed, the public does not currently have an ability to easily evaluate the requested records, which are not currently in the public domain. *See Cmty. Legal Servs.*, 405 F. Supp.2d at 560 (because requested records "clarify important facts" about agency policy, "the CLS request would likely shed light on information that is new to the interested public."). As the Ninth Circuit observed in *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1286 (9th Cir. 1987), "[FOIA] legislative history suggests that information [has more potential to contribute to public understanding] to the degree that the information is new and supports public oversight of agency operations... ."1[1]

Disclosure of these records is not only "likely to contribute," but is certain to contribute, to

public understanding of HHS's actions and decision-making based on intelligence of the early stages or origins of the COVID-19 pandemic. The public is always well served when it knows how the government conducts its activities, particularly matters touching on legal questions. Hence, there can be no dispute that disclosure of the requested records to the public will educate the public about this pressing issue.

**II. Disclosure is Likely to Contribute Significantly to Public Understanding of Government Operations or Activities.**

U.S. Right to Know is not requesting these records merely for their intrinsic informational value. Disclosure of the requested records will significantly enhance the public's understanding of what the HHS Secretary knew about the origins of the COVID-19 pandemic, as compared to the level of public understanding that existed prior to the disclosure. The records are also certain to shed light on the HHS's compliance with its own mission and purpose. Such public oversight of agency action is vital to our democratic system and clearly envisioned by the drafters of the FOIA. Thus, U.S. Right to Know meets this factor as well.

**III. Obtaining the Requested Records is of No Commercial Interest to U.S. Right to Know**

Access to government records, disclosure forms, and similar materials through FOIA requests is essential to U.S. Right to Know's role of educating the general public. Founded in 2014, U.S. Right to Know is a 501(c)(3) nonprofit public interest, public health organization (EIN: 46-5676616). U.S. Right to Know has no commercial interest and will realize no commercial benefit from the release of the requested records.

**IV. U.S. Right to Know's Primary Interest in Disclosure is the Public Interest.**

As stated above, U.S. Right to Know has no commercial interest that would be furthered by disclosure. Although even if it did have an interest, the public interest would far outweigh any pecuniary interest.[1]

U.S. Right to Know is a non-profit organization that informs, educates, and counsels the public regarding corporate wrongdoing and government failures that threaten our food system, our

[1] In this connection, it is immaterial whether any portion of U.S. Right to Know's request may currently be in the public domain because U.S. Right to Know requests considerably more than any piece of information that may currently be available to other individuals. *See Judicial Watch*, 326 F.3d at 1315.

environment, and our health. U.S. Right to Know has been substantially involved in the activities of numerous government agencies for over ten years and has consistently displayed its ability to disseminate information granted to it through FOIA.

In granting U.S. Right to Know's fee waivers, agencies have recognized: (1) that the information requested by U.S. Right to Know contributes significantly to the public's understanding of the government's operations or activities; (2) that the information enhances the public's understanding to a greater degree than currently exists; (3) that U.S. Right to Know possesses the expertise to explain the requested information to the public; (4) that U.S. Right to Know possesses the ability to disseminate the requested information to the general public; (5) and that the news media recognizes U.S. Right to Know as an established expert in the field of public health. U.S. Right to Know's track record of active participation in oversight of governmental activities and decision making, and its consistent contribution to the public's understanding of those activities as compared to the level of public understanding before disclosure, are well established.

U.S. Right to Know intends to use the records requested here similarly. U.S. Right to Know's work appears frequently in news stories online and in print, radio, and TV, including reporting in outlets such as *The New York Times* and *The Guardian*, as well as medical and public health journals such as the *BMJ*. Many media outlets have reported on the food and chemical industries using information obtained by U.S. Right to Know from federal agencies. In 2024, more than 320,000 people visited U.S. Right to Know's extensive website and viewed pages more than 550,000 times. U.S. Right to Know and its staff regularly tweet to a combined following of 55,000 on X (formerly Twitter), and more than 10,000 people follow U.S. Right to Know on Facebook. U.S. Right to Know has more than 17,000 subscribers to its newsletter. U.S. Right to Know intends to use any or all of these distribution channels to share with the public information obtained as a result of this request.

Public oversight and enhanced understanding of the HHS Secretary's duties are necessary. In determining whether disclosure of requested information will contribute significantly to public understanding, a guiding test is whether the requester will disseminate the information to a reasonably broad audience of persons interested in the subject. *Carney*, 19 F.3d 807. U.S. Right to Know need not show how it intends to distribute the information, because "[n]othing in FOIA, the [agency] regulation, or our case law require[s] such pointless specificity." *Judicial Watch*, 326 F.3d at 1314. It is sufficient for U.S. Right to Know to show how it distributes information to the public generally. *Id.*

## REQUEST FOR EXPEDITED PROCESSING

Under FOIA and the HHS's expedited processing regulation, a party who shows "compelling need" is entitled to expedited processing. 5 U.S.C. § 552(a)(6)(E)(i), 45 CFR 5.27 (A)(5)(B). U.S Right to Know easily satisfies the requirements of demonstrating an "urgent need to inform the public."

### I. U.S. Right to Know's Request for Expedited Processing is for Reasons of Urgent Need to Inform the Public.

The FOIA states that "compelling need" or urgent need exists "with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity" 5 U.S.C. § 552(a)(6)(E)(v)(II). The HHS's expedited processing regulation states that an "urgent need to inform the public" can exist regarding "an actual or alleged Federal Government activity" when requested by a "person primarily engaged in disseminating information to the public." As demonstrated below, U.S. Right to Know's request meets all parts of the requirement.

A. **U.S. Right to Know is Primarily Engaged in the Dissemination of Information**

U.S. Right to Know qualifies as a "representative of the news media." U.S. Right to Know is a member of the Institute of Nonprofit News,[2] a national network of 500 independent nonprofit journalism organizations. It has also received journalism awards, including one for coverage of the very topic of this request. In 2025, U.S. Right to Know received a James Madison Freedom of Information Award for its reporting on the origin of COVID-19. The awards, bestowed by the Northern California chapter of the Society for Professional Journalists, recognize people and organizations who have made "significant contributions to advancing freedom of information and expression in the spirit of James Madison, the creative force behind the First Amendment." In its award letter, SPJ NorCal wrote that "U.S. Right to Know's work, and their dedication to pursuing government documents in the face of widespread pushback, has helped the public better understand a pandemic that claimed millions of lives."[3] For FOIA, the HHS must explain any denial of treatment to U.S. Right to Know as a representative of the news media.

---

[2] *See* **https://inn.org/**

[3] Society of Professional Journalists, Northern California Chapter. **https://spjnorcal.org/2025/02/12/spj-norcal-honors-transparency-champions-in-james-madison-freedom-of-i nfor mation-awards-3/**

U.S. Right to Know thus easily satisfies the definition of an organization primarily engaged in the dissemination of information, i.e., that of "a person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." *Nat. Sec. Archive v. U.S. Dept. of Defense*, 880 18F.2d 1381, 1387 (D.C. Cir. 1989). Indeed, organizations with information dissemination activities that are similar to those of U.S. Right to Know routinely qualify as being "primarily engaged in disseminating information". *See Electronic Privacy Information Center v. Department of Defense*, 241 F. Supp. 2d 5, 11 (D.D.C. 2003) ("EPIC's request for 'news media' status highlighted its publication to date of seven books on privacy, technology and civil liberties issues").

**B. Records Sought are Urgently Needed to Inform the Public of Government Activity**

The topic of this request, which pertains to the origin of a pandemic virus that has killed more than one million Americans, and approximately 20 million people worldwide, is indisputably "a matter of current exigency to the American public" in which "the consequences of delaying a response would compromise a significant recognized interest," two factors routinely considered to comprise an urgent need. *See, for example, Al-Fayed v. C.I.A.*, 254 F.3d 300, 310 (D.C. Cir. 2001). The possibility of a research-related origin of COVID-19 has led to calls to strengthen biosafety regulations nationwide and worldwide.[4] In fact, President Donald Trump signed an Executive Order in May that put broad restrictions on U.S. funding of "dangerous gain-of-function research."[5] However, many hold that the type of virological research under scrutiny is not dangerous and exactly what is needed to prevent future pandemics. Indeed, it is of current and ongoing national debate whether certain research with high-risk pathogens should be more strictly regulated or deregulated to prevent future pandemics. Not only does the ongoing search for the pandemic's origin matter urgently to those who suffered severe consequences of COVID-19 or lost loved ones, but the origin of the pandemic[6] also has immediate consequences for tax allocations and the future direction of science regarding regulations surrounding biosafety.

---

[4] *See e.g.* Carl Zimmer and Benjamin Mueller: **U.S. Tightens Rules on Risky Virus Research,** *The New York Times*. (May 7, 2024.)

[5] 90 FR 19611 (2025). Also available at: **Improving the Safety and Security of Biological Research**. (May 5, 2025)

[6] *See e.g*. David Zweig: **Is Gain-of-Function Research a 'Risk Worth Taking'? Or 'Insanity'?,** *The Free Press.* (March 7, 2023) (Last electronically accessed April 18, 2025); Jocelyn Kaiser: **Making Trouble: The United States is moving to tighten oversight of studies that could make viruses more dangerous. But how far should it go?** (October 19, 2022.); Carl Zimmer and Emily Anthes: **Trump Executive Order Restricts 'Gain of Function' Research on Pathogens**, *The New York Times*. (May 5, 2025); Paula Ebben and Neal Riley: **Scientist who pushed for COVID lab leak theory investigation says high-risk research needs oversight**, CBS News. (May 5, 2025); Alex Mansfield and Tabby Taylor-Buck: **Gain-of-function: Loss-of-funding**, BBC. (May 8, 2025)

In addition, information that the HHS holds about its Secretary's communications and decision-making based on the early stages or origin of COVID-19 is urgently needed to confirm or deny recent claims made by the current administration that a laboratory-related origin of COVID-19 is now confirmed. President Trump recently launched a website,[7] the title of which positions a lab leak as the "true origins of COVID-19." President Trump's appointees, including Secretary of Homeland Security Kristi Noem, FDA Commissioner Marty Makary, and current Health and Human Services Secretary Robert F. Kennedy Jr., have all made statements indicating that the pandemic certainly originated in a laboratory.[8] White House Press Secretary Karoline Leavitt told reporters that a research-related origin of COVID is now "confirmable truth."[9] However, if the state of the U.S. government's knowledge of the origin of the pandemic does not allow it to reach such strong conclusions, the White House is currently misleading the public, and the public urgently needs to know about such ongoing deception. It has been reported that the CIA assesses with "low confidence" that the pandemic originated in a lab.[10] In the case that the White House is making false claims of certainty, the HHS should release what communications and actions its HHS Secretary took during the early stages that could shed light on the origins topic to provide the public with more nuanced information and to counter any misleading statements.

Furthermore, courts have held that the "urgency" standard is essentially synonymous with media interest. *See Electronic Privacy Info. Ctr. v. Nat'l Sec. Comm'n*, 419 F. Supp. 3d 82, 95 (D.D.C. 2019) ("Evidence such as news articles and other contemporary documents may illuminate whether EPIC's FOIA requests meet the 'urgency to inform' standard."); *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 299 (D.D.C. 2017) ("[b]ut as evidence that they were justified [in their claim of urgency to inform the public], one need look no further than the widespread media attention—including by some of the nation's most prominent news outlets"). *Oversight v. U.S. Dep't of Justice*, 292 F. Supp. 3d 501, 507-08 (D.D.C. 2018) (start and end with review of the media coverage). Here, there is no question of media interest in the information that U.S. Right to Know seeks to analyze and disseminate, namely, decision-making and communications of the HHS Secretary with high-ranking U.S. government officials during the early stages of the COVID-19 pandemic and based on intelligence about its origins. Thousands of media articles have been published on the subject since 2020, with

---

[7] *See:* **LAB LEAK: The true origin of COVID-19**.

[8] *See e.g.* Daniel Engber: **Trump Thinks He Knows What Started the Pandemic**, *The Atlantic*. (May 21, 2025).

[9] *See* **Press Secretary Karoline Leavitt Briefs Members of the Media, Jan. 31, 2025**. [Video] (Jan 31, 2025)

[10] *See e.g*. Julian E. Barnes: **C.I.A. Now Favors Lab Leak Theory to Explain Covid's Origins**, The New York Times. (January 25, 2025).

dozens published in the past three months alone.[11] Indeed, courts have routinely found that much lesser showings of media interest are sufficient to warrant expedited processing. *See e.g., American Civil Liberties Union v. United States Department of Justice*, 321 F. Supp. 2d 24, 32 (D.D.C. 2004) (handful of articles sufficient to show sufficient media interest for expedited processing). *Brennan Ctr. for Justice at NYU Sch. of Law v. Dep't of Commerce*, 498 F. Supp. 3d 87, 97 (D.D.C. 2020) (fifty recent articles more than sufficient). Despite the overwhelming media interest, the question of COVID origins, about which U.S. Right to Know seeks to inform the public, has yet to be answered. Both President Donald Trump and leaders in the intelligence community have expressed urgency in declassifying information about what is known of the pandemic's origins to the public.[12]

In addition, the work of the Intelligence Community and other federal agencies – including HHS – in identifying the origin of COVID-19 and declassifying related documents has itself become, and continues to be, an area of interest to the media and the public.[13] Recent news reports have highlighted scientists' views that the government needs to release more details around intelligence assessments on, and communications exchanged by officials about, the pandemic's origin.[14] One recent news story quoted CIA director John Ratcliffe as saying he wants to make declassifying intelligence on the pandemic's origins a priority.[15] The new Director of National Intelligence Tulsi Gabbard has empaneled a task force to declassify information in the public interest, including intelligence related to COVID-19: "President Trump promised the American people maximum transparency and accountability," Gabbard said in a statement about the initiative. "We are committed to executing the president's vision and focusing the intelligence community on its core mission: ensuring our security by providing the president and policymakers with timely, apolitical, objective, relevant intelligence to inform their decision-making to ensure the safety, security, and freedom of the American people."[16]

---

[11] *See* Attachment 1: Recent Media Articles

[12] For example, the White House recently launched a website dedicated to the origin of COVID-19, titled **LAB LEAK: The true origin of COVID-19.**

[13] *See e.g*. Jeremy Herb and Natasha Bertrand: **US Energy Department assesses Covid-19 likely resulted from lab leak, furthering US intel divide over virus origin**, CNN. (February 27, 2023); Jon Cohen: **CIA bribed its own COVID-19 origin team to reject lab-leak theory, anonymous whistleblower claims**, *Science*. (September 12, 2023); Sharri Markson: **US intelligence censored over scientists' findings on likely origins of Covid-19**, *The Australian*. (August 23, 2024); Julian E. Barnes: **C.I.A. Now Favors Lab Leak Theory to Explain Covid's Origins**, The New York Times. (January 25, 2025); Katherine Eban: **Exclusive: Inside the FBI's Lab Leak Investigation**, *Vanity Fair*. (February 27, 2025). Karolina Corin and Lewis Kamb: **US intelligence agency's classified analysis offers detailed scientific view that COVID-19 may have come from Wuhan lab**, *US Right to Know*. (April 7, 2025).

[14] *See e.g.* Daniel Engber: **Trump Thinks He Knows What Started the Pandemic**, *The Atlantic*. (May 21, 2025).

[15] *See e.g*. Julian E. Barnes: **C.I.A. Now Favors Lab Leak Theory to Explain Covid's Origins,** The New York Times. (January 25, 2025).

[16] *See. e.g.* Julian E. Barnes: **Gabbard Starts a Task Force Focused on Politicization of the Intelligence Agencies**, *The New York Times*. (April 8, 2025).

It is furthermore not in dispute that the information sought pertains to “government activity”. *See supra* at “REQUEST FOR FEE WAIVER”, I (A) (explaining how records sought pertain to “government activity”).

Thus, the current request is of an “urgent need,” seeking the release of communications exchanged with the then-highest-ranking government health official, with other high-ranking officials, to a person who is primarily engaged in disseminating information with an urgency to inform the public concerning federal government activity. The HHS must address this request for expedited processing; failure to do so is *prima facie* arbitrary and capricious. inform the public concerning federal government activity. The HHS must address this request for expedited processing; failure to do so is *prima facie* arbitrary and capricious.

We certify that the information given above to support our request for expedited processing is true and correct, to the best of our knowledge.

Please send the documents electronically in PDF format to Lewis Kamb at lewis@usrtk.org. If you need additional information, please call, rather than write, Lewis Kamb at (206) 735-6299.

Thank you so much for your help in filling this request.

Sincerely,

Lewis Kamb
Investigative Reporter

Hana Mensendiek
Investigator

Gary Ruskin
Executive Director

# EXHIBIT C

EXHIBIT C TO FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

U.S. RIGHT TO KNOW
*Pursuing truth and transparency for public health*

November 19, 2025

FOIA Officer
Centers for Disease Control and Prevention
Hubert H. Humphrey Building, Room 729H
200 Independence Avenue, SW
Washington, DC 20201

Submitted via FOIA.gov

**RE: Freedom of Information Act request for CDC records about UTMB notification under CDC grant numbers U01GH002091 / U01CK000512**

Dear FOIA Officer**:**

This is a request under the Freedom of Information Act, 5 U.S.C. § 552, *et seq.*, to the Centers for Disease Control and Prevention (CDC).

I request the following records created or received between October 1, 2022 and August 31, 2023:

1. Written notifications, memoranda, reports, letters, emails (including attachments) and/or presentations sent from the University of Texas Medical Branch (UTMB) to the Centers for Disease Control and Prevention (CDC) regarding an unexpected phenotype (increased virulence/neurological symptoms in K18-hACE2 mice) observed in chimeric SARS-CoV-2 viruses supported in whole or in part by CDC funds (including, but not limited to, CDC grant numbers U01GH002091 / U01CK000512).
2. Written correspondence, emails (including attachments), memoranda, letters, reports and/or notes acknowledging receipt of the UTMB notification described in item #1 above, including correspondence involving Program Officer Amy Y. Yang, Ph.D., the Division of Vector-Borne Diseases, and/or the Division of High-Consequence Pathogens and Pathology.
3. Any CDC response and/or follow-up correspondence to UTMB concerning the experiments described in item #1 above, and/or the continuation of the funded work.

We request that you disclose these documents and materials as they become available to you, without waiting until all the documents have been assembled. If documents are denied in whole or in part, please specify which exemption(s) is (are) claimed for each passage or whole document denied. Give the number of pages in each document and the total number of pages pertaining to this request and the dates of documents withheld. We request that excised material be "blacked out" rather than "whited out" or cut out and that the remaining non-exempt portions of documents be released as provided under the Freedom of Information Act

Please advise of any destruction of records and include the date of and authority for such destruction.

## **REQUEST FOR FEE WAIVER**

FOIA was designed to provide citizens a broad right to access government records. FOIA's basic purpose is to "open agency action to the light of public scrutiny," with a focus on the public's "right to be informed about what their government is up to." *NARA v. Favish*, 541 U.S. 157, 171 (2004) quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773-74 (1989) (internal quotation and citations omitted). In order to provide public access to this information, FOIA's fee waiver provision requires that "[d]ocuments shall be furnished without any charge or at a [reduced] charge," if the request satisfies the standard. 5 U.S.C. § 552(a)(4)(A)(iii). FOIA's fee waiver requirement is "liberally construed." *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1310 (D.C. Cir. 2003); *Forest Guardians v. U.S. Dept. of Interior*, 416 F.3d 1173, 1178 (10th Cir. 2005).

The 1986 fee waiver amendments were designed specifically to provide non-profit organizations such as U.S. Right to Know access to government records without the payment of fees. Indeed, FOIA's fee waiver provision was intended "to prevent government agencies from using high fees to discourage certain types of requesters and requests," which are "consistently associated with requests from journalists, scholars, and *non-profit public interest groups*." *Ettlinger v. FBI*, 596 F. Supp. 867, 872 (D. Mass. 1984) (emphasis added). As one Senator stated, "[a]gencies should not be allowed to use fees as an offensive weapon against requesters seeking access to Government information ... ." 132 Cong. Rec. S. 14298 (statement of Senator Patrick Leahy).

### **I. U.S. Right to Know Qualifies for a Fee Waiver.**

Under FOIA, a party is entitled to a fee waiver when "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the [Federal] government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

Thus, the CDC must consider six factors to determine whether a request is in the public interest: (1) whether the subject of the requested records concerns "the operations or activities of the Federal government," (2) whether the disclosure is "likely to contribute" to an understanding of government operations or activities, (3) whether the disclosure "will contribute to public understanding" of a reasonably broad audience of persons interested in the subject, (4) whether the disclosure is likely to contribute "significantly" to public understanding of government operations or activities. *Id*. § 2.107(1)(2), (5) whether a commercial interest exists and its magnitude, and (6) the primary interest in disclosure. As shown below, U.S. Right to Know meets each of these factors.

**A. The Subject of This Request Concerns "The Operations and Activities of the Government."**

The subject matter of this request concerns the operations and activities of the CDC. This request is about the CDC's knowledge of coronavirus research conducted by Dr. Pei-Yong Shi's laboratory at the University of Texas Medical Branch. This FOIA will provide U.S. Right to Know and the public with crucial insight into potentially risky biomedical experiments that were partly funded and overseen by the CDC as part of scientific efforts nationwide to understand SARS-CoV-2 during the COVID pandemic. It is clear that a federal agency's oversight of health, safety and security threats, both foreign and in the U.S. is a specific and identifiable activity of the government, and in this case it is the executive branch agency of the CDC. *Judicial Watch*, 326 F.3d at 1313 ("[R]easonable specificity is all that FOIA requires with regard to this factor") (internal quotations omitted). Thus, U.S. Right to Know meets this factor.

**B. Disclosure is "Likely to Contribute" to an Understanding of Government Operations or Activities.**

The requested records are meaningfully informative about government operations or activities and will contribute to an increased understanding of those operations and activities by the public.

Disclosure of the requested records will allow U.S. Right to Know to convey to the public information about the CDC's role as a funder and regulator of scientific research involving potentially risky experiments with SARS-CoV-2 during the COVID pandemic. Once the information is made available, U.S. Right to Know will analyze it and present it to the general public in a manner that will meaningfully enhance the public's understanding of this topic.

Thus, the requested records are likely to contribute to an understanding of the NIH's operations and activities.

**C. Disclosure of the Requested Records Will Contribute to a Reasonably Broad Audience of Interested Persons' Understanding of the origins of the COVID-19 Pandemic**

The requested records will contribute to public understanding of whether the CDC's role as a regulator and overseer of risky research, including experiments involving pathogens of pandemic potential, has fulfilled its stated core mission "of protecting Americans from infectious and communicable diseases and investing in innovation to prevent, detect, and respond to such public health threats." As explained above, the records will contribute to public understanding of this topic.

Activities of the CDC in general, and specifically as a regulator and overseer of risky biomedical research, including experimentation with special agents and pathogens of pandemic potential, are areas of interest to a reasonably broad segment of the public. U.S. Right to Know will use the information it obtains from the disclosed records to educate the public at large about this topic. *See W. Watersheds Proj. v. Brown*, 318 F. Supp.2d 1036, 1040 (D. Idaho 2004) (finding that "WWP adequately specified the public interest to be served, that is, educating the public about the ecological conditions of the land managed by the BLM and also how ... management strategies employed by the BLM may adversely affect the environment").

Through U.S. Right to Know's synthesis and dissemination (by means discussed in Section II, below), disclosure of information contained in and gleaned from the requested records will contribute to a broad audience of persons who are interested in the subject matter. *Ettlinger v. FBI*, 596 F. Supp. at 876 (benefit to a population group of some size distinct from the requester alone is sufficient); *Carney v. Dept. of Justice*, 19 F.3d 807, 815 (2d Cir. 1994), *cert. denied*, 513 U.S. 823 (1994) (applying "public" to require a sufficient "breadth of benefit" beyond the requester's own interests); *Cmty. Legal Servs. v. Dep't of Hous. & Urban Dev*., 405 F. Supp.2d 553, 557 (E.D. Pa. 2005) (in granting fee waiver to community legal group, court noted that while the requester's "work by its nature is unlikely to reach a very general audience," "there is a segment of the public that is interested in its work").

Indeed, the public does not currently have an ability to easily evaluate the requested records, which are not currently in the public domain. *See Cmty. Legal Servs.*, 405 F. Supp.2d at 560 (because requested records "clarify important facts" about agency policy, "the CLS request would likely shed light on information that is new to the interested public.").
As the Ninth Circuit observed in *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1286 (9th Cir. 1987), "[FOIA] legislative history suggests that information [has more potential to contribute to public understanding] to the degree that the information is new and supports public oversight of agency operations... ."1[1]

Disclosure of these records is not only "likely to contribute," but is certain to contribute, to public understanding of CDC's activities toward overseeing risky biomedical research involving

pathogens of pandemic potential, specifically SARS-CoV-2. The public is always well served when it knows how the government conducts its activities, particularly matters touching on legal questions. Hence, there can be no dispute that disclosure of the requested records to the public will educate the public about this pressing issue.

**II. Disclosure is Likely to Contribute Significantly to Public Understanding of Government Operations or Activities.**

U.S. Right to Know is not requesting these records merely for their intrinsic informational value. Disclosure of the requested records will significantly enhance the public's understanding of what the NIH knew about potentially risky gain-of-function research experiments on SARS-CoV-2. The records are also certain to shed light on the NIH's compliance with its own mission and purpose. Such public oversight of agency action is vital to our democratic system and clearly envisioned by the drafters of the FOIA. Thus, U.S. Right to Know meets this factor as well.

**III. Obtaining the Requested Records is of No Commercial Interest to U.S. Right to Know**

Access to government records, disclosure forms, and similar materials through FOIA requests is essential to U.S. Right to Know's role of educating the general public. Founded in 2014, U.S. Right to Know is a 501(c)(3) nonprofit public interest, public health organization (EIN: 46-5676616). U.S. Right to Know has no commercial interest and will realize no commercial benefit from the release of the requested records.

**IV. U.S. Right to Know's Primary Interest in Disclosure is the Public Interest.**

As stated above, U.S. Right to Know has no commercial interest that would be furthered by disclosure. Although even if it did have an interest, the public interest would far outweigh any pecuniary interest.[1]

U.S. Right to Know is a non-profit organization that informs, educates, and counsels the public regarding corporate wrongdoing and government failures that threaten the integrity of our food system, our environment and our health. U.S. Right to Know has been substantially involved in the activities of numerous government agencies for over eight years, and has consistently displayed its ability to disseminate information granted to it through FOIA.

In granting U.S. Right to Know's fee waivers, agencies have recognized: (1) that the information requested by U.S. Right to Know contributes significantly to the public's understanding of the

[1] In this connection, it is immaterial whether any portion of U.S. Right to Know's request may currently be in the public domain because U.S. Right to Know requests considerably more than any piece of information that may currently be available to other individuals. *See Judicial Watch*, 326 F.3d at 1315.

government's operations or activities; (2) that the information enhances the public's understanding to a greater degree than currently exists; (3) that U.S. Right to Know possesses the expertise to explain the requested information to the public; (4) that U.S. Right to Know possesses the ability to disseminate the requested information to the general public; (5) and that the news media recognizes U.S. Right to Know as an established expert in the field of public health. U.S. Right to Know's track record of active participation in oversight of governmental activities and decision making, and its consistent contribution to the public's understanding of those activities as compared to the level of public understanding prior to disclosure are well established.

U.S. Right to Know intends to use the records requested here similarly. U.S. Right to Know's work appears frequently in news stories online and in print, radio and TV, including reporting in outlets such as *The New York Times* and *The Guardian*, as well as medical and public health journals such as the *BMJ*. Many media outlets have reported about the food and chemical industries using information obtained by U.S. Right to Know from federal agencies. In 2022, more than 725,000 people visited U.S. Right to Know's extensive website, and viewed pages more than one million times. U.S. Right to Know and its staff regularly tweet to a combined following of nearly 50,000 on Twitter, and more than 9,600 people follow U.S. Right to Know on Facebook, U.S. Right to Know intends to use any or all of these media outlets to share with the public information obtained as a result of this request.

Public oversight and enhanced understanding of the NIH's duties is absolutely necessary. In determining whether disclosure of requested information will contribute significantly to public understanding, a guiding test is whether the requester will disseminate the information to a reasonably broad audience of persons interested in the subject. *Carney*, 19 F.3d 807. U.S. Right to Know need not show how it intends to distribute the information, because "[n]othing in FOIA, the [agency] regulation, or our case law require[s] such pointless specificity." *Judicial Watch*, 326 F.3d at 1314. It is sufficient for U.S. Right to Know to show how it distributes information to the public generally. *Id.*

## <u>REQUEST FOR EXPEDITED PROCESSING</u>

Under FOIA, and the CDC's own expedited processing regulation, a party who shows "compelling need" is entitled to expedited processing. 5 U.S.C. § 552(a)(6)(E)(i), 32 CFR § 1900.34(a). U.S Right to Know easily satisfies the requirements of demonstrating "compelling need."

**I. U.S. Right to Know's Request for Expedited Processing is for Reasons of Compelling Need.**

The FOIA states that "compelling need" exists "with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity" 5 U.S.C. § 552(a)(6)(E)(v)(II). The NIH's expedited processing regulation states that "compelling need" exists, "when the request is made by a person primarily engaged in disseminating information and the information is relevant to a subject of public urgency concerning an actual or alleged Federal Government activity." As demonstrated below, U.S. Right to Know's request meets all parts of the requirement.

A. **U.S. Right to Know is Primarily Engaged in the Dissemination of Information**

U.S. Right to Know qualifies as a "representative of the news media." U.S. Right to Know is a member of the Institute of Nonprofit News,[2] a national network of 475 independent nonprofit journalism organizations. It has also received journalism awards, including one for coverage of the very topic of this request. In 2025, U.S. Right to Know received a James Madison Freedom of Information Award for its reporting on the origin of COVID-19. The awards, bestowed by the Northern California chapter of the Society for Professional Journalists, recognize people and organizations who have made "significant contributions to advancing freedom of information and expression in the spirit of James Madison, the creative force behind the First Amendment." In its award letter, SPJ NorCal wrote that "U.S. Right to Know's work, and their dedication to pursuing government documents in the face of widespread pushback, has helped the public better understand a pandemic that claimed millions of lives."[3] For the purpose of FOIA, CDC must explain any denial of treatment of U.S. Right to Know as a representative of the news media.

U.S. Right to Know thus easily satisfies the definition of an organization primarily engaged in the dissemination of information, i.e., that of "a person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." *Nat. Sec. Archive v. U.S. Dept. of Defense*, 880 18F.2d 1381, 1387 (D.C. Cir. 1989). Indeed, organizations with information dissemination activities that are similar to those of U.S. Right to Know routinely qualify as being "primarily engaged in disseminating information". *See Electronic Privacy Information Center v. Department of Defense*, 241 F. Supp. 2d 5, 11 (D.D.C. 2003) ("EPIC's request for `news media' status highlighted its publication to date of seven books on privacy, technology and civil

[2] See https://inn.org/.
[3] Society of Professional Journalists, Northern California Chapter.
https://spjnorcal.org/2025/02/12/spj-norcal-honors-transparency-champions-in-james-madison-freedom-of-info r mation-awards-3/

liberties issues").

**B. Records Sought are Urgently Needed to Inform the Public of Government Activity**

The topic of this request, which pertains to risky biomedical research involving a pandemic virus that has killed more than one million Americans, is indisputably "a matter of current exigency to the American public" in which "the consequences of delaying a response would compromise a significant recognized interest," two factors routinely considered to comprise an urgent need. See *Al-Fayed v. C.I.A.*, 254 F.3d 300, 310 (D.C. Cir. 2001). The possibility of a research-related origin of COVID-19 has led to calls to strengthen biosafety regulations nationwide and worldwide. [4] In fact, President Donald Trump signed an Executive Order in May which puts broad restrictions on U.S. funding of "dangerous gain of function research."[5] However, many hold that the type of virological research under scrutiny is not dangerous and exactly what is needed to prevent future pandemics. Indeed, it is of current and ongoing national debate whether certain research with high-risk pathogens should be more strictly regulated or deregulated in order to prevent future pandemics.[6] Not only does the ongoing search for the pandemic's origin matter urgently to those who suffered severe consequences of COVID-19 or lost loved ones, but the origin of the pandemic also has immediate consequences for tax allocation, and the future direction of science regarding regulations surrounding biosafety.

Furthermore, courts have held that the "urgency" standard is essentially synonymous with media interest. *See Electronic Privacy Info. Ctr. v. Nat'l Sec. Comm'n*, 419 F. Supp. 3d 82, 95 (D.D.C. 2019) ("Evidence such as news articles and other contemporary documents may illuminate whether EPIC's FOIA requests meet the 'urgency to inform' standard."); *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 299 (D.D.C. 2017) ("[b]ut as evidence that they were justified [in their claim of urgency to inform the public], one need look no further than the widespread media attention—including by some of the nation's most prominent news outlets"). *Oversight v. U.S. Dep't of Justice*, 292 F. Supp. 3d 501, 507-08 (D.D.C. 2018) (start and end with review of the media coverage). Here, there is no question of media interest in the information that U.S. Right to Know seeks to analyze and disseminate, namely potentially risky biomedical research. Thousands of media articles have been published on

---

[4] *See e.g.* Carl Zimmer and Benjamin Mueller: U.S. Tightens Rules on Risky Virus Research, *The New York Times*. (May 7, 2024.)

[5] 90 FR 19611 (2025). Also available at: Improving the Safety and Security of Biological Research. (May 5, 2025).

[6] *See e.g*. David Zweig: Is Gain-of-Function Research a 'Risk Worth Taking'? Or 'Insanity'?, *The Free Press.* (March 7, 2023) (Last electronically accessed April 18, 2025); Jocelyn Kaiser: Making Trouble: The United States is moving to tighten oversight of studies that could make viruses more dangerous. But how far should it go? (October 19, 2022.); Carl Zimmer and Emily Anthes: Trump Executive Order Restricts 'Gain of Function' Research on Pathogens, *The New York Times*. (May 5, 2025); Paula Ebben and Neal Riley: Scientist who pushed for COVID lab leak theory investigation says high-risk research needs oversight, CBS News. (May 5, 2025); Alex Mansfield and Tabby Taylor-Buck: Gain-of-function: Loss-of-funding, BBC. (May 8, 2025).

related subjects since 2020, including dozens of articles published about scientists who believe that risky biomedical research funded by the U.S. and regulated by the CDC and other federal agencies puts the public at undue risk and may have caused the COVID pandemic. Several articles have been published in the past month alone.[7] Indeed, courts have routinely found that much lesser showings of media interest are sufficient to warrant expedited processing. *See e.g., American Civil Liberties Union v. United States Department of Justice*, 321 F. Supp. 2d 24, 32 (D.D.C. 2004) (handful of articles sufficient to show sufficient media interest for expedited processing). *Brennan Ctr. for Justice at NYU Sch. of Law v. Dep't of Commerce*, 498 F. Supp. 3d 87, 97 (D.D.C. 2020) (fifty recent articles more than sufficient). Despite the overwhelming media interest, the question of COVID origins, about which U.S. Right to Know seeks to inform the public, has yet to be answered. Both President Donald Trump and leaders in the intelligence community have expressed urgency in declassifying information about what is known of the pandemic's origins to the public.[8]

In addition, the work of the Intelligence Community in identifying the origin of COVID-19 and declassifying related documents, has itself become, and continues to be, an area of interest to the media and the public.[9] Recent news reports have highlighted scientists' views that the government needs to release more details around intelligence assessments on the pandemic's origin,[10] and quote CIA director John Ratcliffe as saying he wants to make declassifying intelligence on the pandemic's origins a priority.[11] The new Director of National Intelligence Tulsi Gabbard has empaneled a task force to declassify information in the public interest, including intelligence related to COVID-19: "President Trump promised the American people maximum transparency and accountability," Gabbard said in a statement about the initiative. "We are committed to executing the president's vision and focusing the intelligence community on its core mission: ensuring our security by providing the president and policymakers with timely, apolitical, objective, relevant intelligence to inform their decision-making to ensure the safety, security and freedom of the American people."[12]

It is furthermore not in dispute that the information sought pertains to "government activity".

---

[7] See Attachment 1: Recent Media Articles.

[8] For example, the White House recently launched a website dedicated to the origin of COVID-19, titled LAB LEAK: The true origin of COVID-19.

[9] *See e.g*. Jeremy Herb and Natasha Bertrand: US Energy Department assesses Covid-19 likely resulted from lab leak, furthering US intel divide over virus origin, CNN. (February 27, 2023); Jon Cohen: CIA bribed its own COVID-19 origin team to reject lab-leak theory, anonymous whistleblower claims, *Science*. (September 12, 2023); Sharri Markson: US intelligence censored over scientists' findings on likely origins of Covid-19, *The Australian*. (August 23, 2024); Julian E. Barnes: C.I.A. Now Favors Lab Leak Theory to Explain Covid's Origins, The New York Times. (January 25, 2025); Katherine Eban: Exclusive: Inside the FBI's Lab Leak Investigation, *Vanity Fair*. (February 27, 2025). Karolina Corin and Lewis Kamb: US intelligence agency's classified analysis offers detailed scientific view that COVID-19 may have come from Wuhan lab, *US Right to Know*. (April 7, 2025).

[10] *See e.g.* Daniel Engber: Trump Thinks He Knows What Started the Pandemic, *The Atlantic*. (May 21, 2025).

[11] *See e.g*. Julian E. Barnes: C.I.A. Now Favors Lab Leak Theory to Explain Covid's Origins, The New York Times. (January 25, 2025).

[12] *See. e.g.* Julian E. Barnes: Gabbard Starts a Task Force Focused on Politicization of the Intelligence Agencies, *The New York Times*. (April 8, 2025).

*See supra* at “REQUEST FOR FEE WAIVER”, I (A) (explaining how records sought pertain to “government activity”).

Thus, the current request is of “compelling need,” having been made by an organization primarily engaged in disseminating information with an urgency to inform the public concerning federal government activity. The CDC must address this request for expedited processing; failure to do so is *prima facie* arbitrary and capricious.

We certify that the information given above to support our request for expedited processing is true and correct and to the best of our knowledge.

Please send the documents electronically in PDF format to Lewis Kamb at lewis@usrtk.org. If you need additional information please call, rather than write, Lewis Kamb at (206) 735-6299.

Thank you so much for your help in filling this request.

Sincerely,

Lewis Kamb
Investigative Reporter

Gary Ruskin
Executive Director